# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HAWAIIAN TELCOM COMMUNICATIONS, INC., et al.,[1] | Case No. 08-13086 (_____) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF ROBERT F. REICH, SENIOR VICE PRESIDENT, CHIEF FINANCIAL OFFICER AND TREASURER OF HAWAIIAN TELCOM COMMUNICATIONS, INC., IN SUPPORT OF FIRST DAY PLEADINGS

I, Robert F. Reich, hereby declare under penalty of perjury:

1.     I am the Senior Vice President, Chief Financial Officer and Treasurer of Hawaiian Telcom Communications, Inc., a corporation organized under the laws of the State of Delaware and one of the debtors and debtors in possession (collectively, "Hawaiian Telcom" or the "Debtors") in these chapter 11 cases. In this capacity, I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs and books and records.[2] I am over the age of 18 and competent to testify.

---

[1]   The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Hawaiian Telcom Communications, Inc. (0376); Hawaiian Telcom Holdco, Inc. (9868); Hawaiian Telcom, Inc. (9500); Hawaiian Telcom Services Company, Inc. (5722); Hawaiian Telcom IP Service Delivery Investment, LLC (9423); Hawaiian Telcom IP Service Delivery Research, LLC (9685); Hawaiian Telcom IP Video Investment, LLC (9295); and Hawaiian Telcom IP Video Research, LLC (9571). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 1177 Bishop Street, Honolulu, HI 96813.

[2]   I also serve as Senior Vice President, Chief Financial Officer and Treasurer of Hawaiian Telcom Holdco, Inc., Hawaiian Telcom, Inc. and Hawaiian Telcom Services Company, Inc. Hawaiian Telcom Services Company, Inc. is the sole member of Hawaiian Telcom IP Service Delivery Investment, LLC (which in turn is the sole member of Hawaiian Telcom IP Service Delivery Research, LLC) and the sole member of Hawaiian Telcom IP Video Investment, LLC (which in turn is the sole member of Hawaiian Telcom IP Video Research, LLC).

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed 12/22/08   Page 1 of 44

2. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information gathered from my review of relevant documents and information supplied to me by other members of Hawaiian Telcom's management and Hawaiian Telcom's advisors. I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Preliminary Statement

3. Hawaiian Telcom—the leading provider of telecommunications services in the State of Hawaii—commenced these cases in furtherance of an ongoing effort to improve operating results and to reduce debt.

4. For the past 125 years, Hawaiian Telcom (or its predecessors) has served as the incumbent local exchange carrier ("ILEC") for the State of Hawaii. In May 2005, Hawaiian Telcom became a standalone telecommunications provider after Carlyle Partners III Hawaii, L.P., CP Coinvestment III, L.P. and Carlyle Hawaii Partners L.P. (collectively, "The Carlyle Group") purchased the Hawaiian Telcom businesses from Verizon Communications Inc. ("Verizon").

5. Since the acquisition, Hawaiian Telcom has faced significant short- and long-term challenges, including, among other things, keeping pace with quickly-evolving telecommunications technologies, overcoming difficulties with respect to the transition of certain back-office functions from Verizon and satisfying its capital expenditure needs while meeting its debt service requirements. As a result of these challenges, as well as the current economic downturn, Hawaiian Telcom has not attained the performance levels projected at the time of the acquisition from Verizon.

2

6.      In connection with various strategic initiatives aimed at improving operating results, Hawaiian Telcom introduced a new management team in early 2008.  The new management team immediately began to develop a revised strategic business plan focused on introducing new products, simplifying existing product offerings, improving customer service, leveraging network infrastructure, improving processes and systems and rebuilding customer confidence.  In addition, Hawaiian Telcom is exploring other product development opportunities, cost reduction initiatives, asset rationalization and capital raising opportunities as part of a financial restructuring.

7.      One of the new management team's most significant efforts has been to try to reduce Hawaiian Telcom's debt obligations to allow Hawaiian Telcom to use its cash resources to execute on its revised strategic business plan.  Hawaiian Telcom has not only tried to convert existing debt into, or raise additional equity capital from, both existing and third-party investors, but also has explored the viability of a sale of all or substantially all of its assets.  In September 2008, with Hawaiian Telcom's assistance, a group of the senior lenders under Hawaiian Telcom's senior secured credit facility (the "Bank Group") and certain holders of the Senior Notes Due 2013, who claim to own not less than 50% of such Notes (the "Ad Hoc Noteholder Committee"), organized and retained professional advisors.

8.      As a result of its efforts, Hawaiian Telcom has received a conditional equity investment proposal from The Carlyle Group as part of a financial restructuring and continues to maintain an active dialogue with third parties regarding potential equity investments and a potential sale of all or substantially all of Hawaiian Telcom's assets.  But after analyzing its options, Hawaiian Telcom determined it is in the best interests of all stakeholders for each of the Debtors to file a voluntary petition for relief under chapter 11 of title 11 of the United States

3

K&E 13599326.13

PHIL1 817784-1

Code (the "Bankruptcy Code") and to continue to pursue restructuring alternatives—including the strategic paths detailed herein—under the protections of the Bankruptcy Code.

9. Hawaiian Telcom intends to finance these chapter 11 cases using cash on hand and cash flow from operations. As of the filing date, Hawaiian Telcom has approximately $75 million in cash on hand. Because the lenders under Hawaiian Telcom's prepetition secured credit facility have liens on substantially all of Hawaiian Telcom's assets and the proceeds thereof, Hawaiian Telcom has filed a motion seeking authority to use cash collateral.

10. Given Hawaiian Telcom's core strengths, which include the most extensive and reliable telecommunications network infrastructure in Hawaii, an experienced workforce and available equipment and facilities, Hawaiian Telcom remains confident that, by utilizing the tools afforded by the Bankruptcy Code, Hawaiian Telcom can achieve its long-term goal of becoming the preferred, one-stop provider of communications services and products for business and residential customers throughout Hawaii.

11. To familiarize the Court with Hawaiian Telcom and the relief it will seek in the first days of these cases, I have organized this declaration as follows: Part I describes Hawaiian Telcom's corporate history, corporate structure, business operations and capital structure; Part II describes the events leading to the commencement of these cases; Part III describes Hawaiian Telcom's prepetition restructuring initiatives; and Part IV sets forth the relevant facts in support of each request for relief.

K&E 13599326.13

PHIL1 817784-1

**Part I**

**Corporate History, Corporate Structure, Business Operations and Capital Structure**

     **A.**     **Corporate History**

12.     Hawaiian Telcom (and its predecessors) has been a leading provider of telecommunications services in the State of Hawaii since 1883. Hawaiian Telcom, Inc., incorporated in 1883 as Mutual Telephone Company, has been Hawaii's ILEC for 125 years. From 1967 to 2005, Verizon operated Hawaiian Telcom's businesses as a separate Hawaii division (the "Verizon Hawaii Businesses").[3]

13.     Hawaiian Telcom, Inc. operates the Debtors' regulated local exchange carrier business.[4] Hawaiian Telcom Services Company, Inc. operates the Debtors' other businesses including the interstate and intrastate long distance, internet and wireless businesses.

14.     The Hawaii Public Utilities Commission (the "HPUC") regulates the Debtors' local exchange carrier business, intrastate special access and long distance businesses, as well as the wireless business to a lesser degree. The HPUC does not regulate the Debtors' interstate business or the high-speed internet ("HSI") business.

---

[3]    Verizon Hawaii Inc. and carved-out components of Verizon Information Services, GTE.NET LLC (d/b/a Verizon Online), Bell Atlantic Communications Inc. (d/b/a Verizon Long Distance) and Verizon Select Services, Inc. comprised the Verizon Hawaii Businesses.

[4]    Hawaiian Telcom Insurance Company, Inc., which is a wholly-owned captive insurance subsidiary of Hawaiian Telcom, Inc., provided auto liability, general liability and worker's compensation insurance to Verizon Hawaii Inc. on a direct basis prior to December 31, 2003. Hawaiian Telcom Insurance Company, Inc.'s sole remaining purpose is to continue to settle claims related to incidents that occurred prior to January 1, 2004. Hawaiian Telcom's insurance coverage is described more fully in the Motion of Hawaiian Telcom Communications, Inc., et al. for Entry of an Order Authorizing Debtors to Continue Prepetition Insurance Coverage, which is described below. Hawaiian Telcom Insurance Company, Inc. is not a Debtor in these cases.

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed 12/22/08   Page 5 of 44

15.     On May 2, 2005, The Carlyle Group acquired the Verizon Hawaii Businesses (the "2005 Acquisition").  The Carlyle Group owns 100% of the equity in Hawaiian Telcom Holdco, Inc.  The HPUC approved the 2005 Acquisition on March 16, 2005.

16.     On September 30, 2008, Hawaiian Telcom Services Company, Inc. created four new limited liability companies organized under the laws of the State of Hawaii:

- Hawaiian Telcom IP Video Research, LLC conducts research and development activities to support Hawaiian Telcom's launch of an internet protocol ("IP") based video service.

- Hawaiian Telcom IP Service Delivery Research, LLC conducts research and development activities to support the successful launch of Hawaiian Telcom's other new IP-based services and to expand the availability of Hawaiian Telcom's HSI service.

- Hawaiian Telcom IP Video Investment, LLC and Hawaiian Telcom IP Service Delivery Investment, LLC serve as special purpose entities for the purpose of receiving investments from outside investors.  As of the date hereof, Hawaiian Telcom IP Video Investment, LLC and Hawaiian Telcom IP Service Delivery Investment, LLC have not received any outside investments.

17.     Hawaiian Telcom Services Company, Inc. also operated a directories publishing business until November 30, 2007, when it sold the business to HYP Media Holdings LLC, a Delaware limited liability company and wholly-owned subsidiary of CBD Investor, Inc., for an aggregate purchase price of approximately $435 million.  In connection with the sale (the "Directories Sale"), Hawaiian Telcom entered into a 50-year publishing agreement pursuant to which HYP Media LLC serves as the exclusive, official publisher of telephone directories on behalf of Hawaiian Telcom, Inc.  Under this agreement, HYP Media LLC publishes both white and yellow pages print telephone directories under the Hawaiian Telcom® brand.  The HPUC approved the Directories Sale on November 13, 2007.

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 6 of 44

**B.** **Hawaiian Telcom's Corporate Structure**

18.     The following chart generally depicts Hawaiian Telcom's corporate structure:



Each of the shaded entities is a Debtor in these cases.

**C.** **Hawaiian Telcom's Business Operations**

19.     Hawaiian Telcom offers a wide variety of communications and data services including local access lines, long distance service, HSI and wireless communications in the State of Hawaii.  Hawaiian Telcom serves the telecommunication needs of residential customers, government agencies, large corporate clients and small- and mid-sized businesses.

K&E 13599326.13

PHIL1 817784-1

20.     Hawaiian Telcom operates in two business segments.  The Wireline Services segment provides local telephone service including voice and data transport, enhanced custom calling features, network access and private lines.  In addition, the Wireline Services segment provides HSI, long distance services, customer premise equipment, data solutions, billing and collection and pay telephone services.  Hawaiian Telcom offers these services on all of Hawaii's major islands.  As of September 30, 2008, these telecommunication operations served:

- 524,201 local access lines, of which 57% served residential customers and 42% served business customers, with the remaining 1% serving other customers;

- 253,302 long distance lines, of which 67% served residential customers and 33% served business customers; and

- 95,025 HSI lines, which served 77,757 retail residential lines, 15,810 retail business lines and 1,458 wholesale business lines.

21.     Hawaiian Telcom's Wireless Services segment consists primarily of wireless services, including the sale of wireless handsets and accessories.  Hawaiian Telcom has been providing wireless services since 2005.  Hawaiian Telcom projects the wireless market in Hawaii to grow from the current 810,000 wireless subscribers to 1,100,000 by the end of 2011. Currently, less than two percent of these subscribers utilize Hawaiian Telcom as their wireless provider.  Accordingly, Hawaiian Telcom seeks to capture a higher share of this market and to leverage the Hawaiian Telcom® brand and its existing customer base to enhance customer loyalty for Hawaiian Telcom's various product and service offerings.

### D.     Hawaiian Telcom's Capital Structure

22.     As of September 2008, Hawaiian Telcom's liabilities included $574.5 million under the Credit Agreement (as defined below), $350 million under the Senior Notes Indenture

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 8 of 44

(as defined below), $150 million under the Subordinated Notes Indenture (as defined below) and approximately $40 million of general trade obligations.

### 1.     Credit Agreement

23.     On June 1, 2007, Hawaiian Telcom entered into an amended credit agreement, which provided for a revolving credit facility in the amount of $200 million (of which $90 million is available to Hawaiian Telcom) and a Tranche C term loan in the amount of $860 million.[5] In December 2007, Hawaiian Telcom used proceeds from the Directories Sale to prepay $160 million of the Tranche C term loan. In January 2008, Hawaiian Telcom used proceeds from the Directories Sale to prepay an additional $211 million of the Tranche C term loan and $50 million of the amount outstanding under the revolving credit facility. As of September 30, 2008, approximately $89.8 million in debt remained outstanding under the revolving credit facility and $484.7 million remained outstanding under the Tranche C term loan.

24.     Liens on substantially all of Hawaiian Telcom's assets secure Hawaiian Telcom Communication, Inc.'s obligations under the Credit Agreement. Hawaiian Telcom Holdco, Inc., Hawaiian Telcom, Inc., Hawaiian Telcom Services Company, Inc., Hawaiian Telcom IP Video Research, LLC, Hawaiian Telcom IP Service Delivery Research, LLC, Hawaiian Telcom IP Video Investment, LLC and Hawaiian Telcom IP Service Delivery Investment, LLC guarantee these obligations.[6]

---

[5]    See Amended and Restated Credit Agreement, dated as of June 1, 2007, among Hawaiian Telcom Holdco, Inc., Hawaiian Telcom Communications, Inc., as Borrower, the Lenders Party Thereto and Lehman Commercial Paper Inc., as Administrative Agent and Collateral Agent, Lehman Brothers Inc. and J.P. Morgan Securities Inc. as Joint Lead Arrangers and Joint Bookrunners, JPMorgan Chase Bank, N.A., as Syndication Agent and Cobank ACB and Wachovia Bank, N.A., as Co-Documentation Agents (the "Credit Agreement").

[6]    See Amended and Restated Guarantee and Collateral Agreement, dated as of June 1, 2007, among Hawaiian Telcom Holdco, Inc., Hawaiian Telcom Communications, Inc., the Subsidiaries of Hawaiian Telcom
(Continued…)

K&E 13599326.13

PHIL1 817784-1

## 2. Senior Notes Due 2013 and Subordinated Notes Due 2015

25.     On May 2, 2005, Hawaiian Telcom Communications, Inc. issued three tranches of unsecured Notes.  Pursuant to that certain Indenture, dated as of May 2, 2005, between Hawaiian Telcom Communications, Inc., as issuer, and U.S. Bank National Association, as trustee (the "Senior Notes Indenture"), Hawaiian Telcom issued (a) senior floating rate notes in the aggregate principal amount of $150 million, which mature on May 1, 2013 and bear interest at a rate reset and payable semi-annually at LIBOR, plus 5.5%, and (b) senior fixed rate notes in the aggregate principal amount of $200 million, which  mature on May 1, 2013 and bear interest at a rate of 9.75% per year.  And, pursuant to a second Indenture, dated as of May 2, 2005, between Hawaiian Telcom Communications, Inc., as issuer, and U.S. Bank National Association, as trustee (the "Subordinated Notes Indenture"), Hawaiian Telcom issued senior subordinated notes in the aggregate principal amount of $150 million, which mature on May 1, 2015 and bear interest at a rate of 12.5% per year.  Hawaiian Telcom, Inc. and Hawaiian Telcom Services Company, Inc. guarantee the obligations owing under the Senior Notes Indenture and the Subordinated Notes Indenture.

## Part II

## Events Leading to the Chapter 11 Cases

26.     A confluence of factors have contributed to Hawaiian Telcom's decision to file the chapter 11 cases.  Hawaiian Telcom has yet to attain the performance projections made at the time of the 2005 Acquisition.  Among other things, Hawaiian Telcom has over $1.07 billion in funded debt.  Interest costs on Hawaiian Telcom's significant debt burden impose limitations on

Communications, Inc. Identified Herein and Lehman Commercial Paper Inc., as Collateral Agent (the "Guarantee Agreement").

K&E 13599326.13

PHIL1 817784-1

Hawaiian Telcom's ability to create and offer new products and implement its revised strategic business plan—necessary steps to change the current downward trend of Hawaiian Telcom's generated operating cash flows. Further, the recent turmoil in the equity and credit markets has limited Hawaiian Telcom's ability to attract potential investors and likely will have an adverse effect on consumer spending.

### A. Operating Performance

27. Hawaiian Telcom historically has depended on revenue from traditional telephone access lines as its primary source of revenue. Over the past several years, however, the telecommunications industry has faced significant access line losses as residential and commercial customers increasingly move local voice service to voice-over-internet protocol ("VoIP")—technology commonly offered with cable service. Indeed, the telecommunications industry is in the midst of a shift away from traditional landline telephone service to a more integrated service model, where providers bundle HSI access, video and phone services via an IP, packet-based network. Additionally, there has been a material increase in the use of wireless services in place of traditional landlines.

28. In 2007, local services revenue decreased by $14.8 million—a 6.6% loss compared to 2006 numbers. Additionally, revenue from long distance services and network access has decreased further due to customers' shifts from access lines to IP-based and wireless solutions, as well as a decrease in prices due to competitive pressures. For 2007, network access services revenue decreased by $7.2 million, or 4.8%, compared to 2006. Long distance revenue decreased by $2.4 million, or 6.1%, for 2007 compared to the prior year.

29. Increased competition also has had an adverse effect on revenues from non-traditional services. Residential customers continue to disconnect "second lines," which were

11

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed 12/22/08   Page 11 of 44

dedicated to dial-up Internet access as they switch to HSI and cable broadband service. HSI and other Internet revenues decreased by $3.8 million, or 9.6%, for 2007 as compared to the prior year. The decrease is partially due to the elimination of the billing for (and related cost of) a government surcharge as well as certain promotional pricing programs, which started during 2007 and which the Debtors expect to continue.

### B. ILEC Regulations

30. Unlike many of Hawaiian Telcom's competitors, Hawaiian Telcom, as an ILEC, is subject to regulatory requirements and constraints imposed by the Federal Communications Commission (the "FCC") and the HPUC. The Debtors suffer a competitive disadvantage because their competitors, who are not ILECs, do not face the same regulatory requirements and constraints.

### C. Transition Difficulties

31. After the 2005 Acquisition, the transition from operating as a subsidiary of Verizon to a standalone service provider had an adverse effect on business operations. Pursuant to the terms of the acquisition agreement, Verizon remained responsible for critical functions such as internal information technology ("IT"), including customer care, order management, billing and supply chain systems, until February 2006. Hawaiian Telcom engaged BearingPoint Inc. ("BearingPoint") to build a back-office IT infrastructure to allow Hawaiian Telcom to migrate off Verizon's systems by February 2006.

32. The back-office IT infrastructure, however, was not fully functional by the February 2006 cutover date, and Verizon and Hawaiian Telcom extended the cutover date to April 1, 2006. As a result, Hawaiian Telcom incurred significant expenses to retain third-party service providers to provide call center and manual order processing services and to compensate

12

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 12 of 44

Hawaiian Telcom's employees for resultant overtime. Ultimately, customer satisfaction suffered and customers began to shift to communications services provided by Hawaiian Telcom's competitors.

33. On February 5, 2007, Hawaiian Telcom hired Accenture LLP ("Accenture") to complete the development and deployment of key back-office and IT systems. Despite Accenture's efforts, however, Hawaiian Telcom is still experiencing systems functionality issues and is working expeditiously to improve its back-office and IT systems—both of which are critical to the efforts to fully implement the revised strategic business plan, to improve customer satisfaction and to compete effectively in the marketplace. Until Hawaiian Telcom and Accenture progress further in the development of the back-office and IT systems, Hawaiian Telcom will continue to incur additional expenses in its attempt to maintain acceptable operating performance levels.

### D. Market Turmoil

34. Faced with these issues, Hawaiian Telcom also found itself in the midst of the current economic downturn, which Hawaiian Telcom expects to impact consumer spending and to cause consumers to look to the Debtors' competitors for value-priced, bundled options for their telephone, Internet and television needs. These issues highlight Hawaiian Telcom's need to improve customer satisfaction, enhance existing products (e.g., improving HSI speeds) and to develop new products, such as an IP-based video service. Such measures will allow Hawaiian Telcom to compete more effectively in the marketplace, especially in a down economy.

### Part III

### Out-of-Court Restructuring Initiatives

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 13 of 44

35.     Beginning in late 2007, Hawaiian Telcom began to take additional measures to improve its operating performance, including recruiting a new management team, devising a revised strategic business plan, engaging significant stakeholders in prepetition restructuring discussions and marketing the business to numerous potential strategic and financial investors.

### A.     Introduction of the New Management Team and the Revised Strategic Business Plan

36.     From October 2007 through the first quarter of 2008, the Debtors reduced the management headcount by approximately 100 positions and began to pursue other initiatives designed to improve Hawaiian Telcom's operating results.

37.     On February 4, 2008, Hawaiian Telcom announced the resignation of the then-chief executive officer.  Hawaiian Telcom engaged Zolfo Cooper (f/k/a Kroll Zolfo Cooper LLC), a restructuring advisory firm, to provide interim executive management services to Hawaiian Telcom pending the hiring of a new chief executive officer and executive management team.  On May 8, 2008, Hawaiian Telcom appointed Eric K. Yeaman as its new President and Chief Executive Officer.  Hawaiian Telcom also hired several new members of senior management—all of whom have extensive experience in the telecommunications industry or have strong ties to the local Hawaii business community.

38.     The new management team is beginning to implement a revised strategic plan which is focused on the introduction of new products, simplifying Hawaiian Telcom's existing product offerings, improving customer service, leveraging its network infrastructure, improving processes and systems and rebuilding customer confidence.  In addition, Hawaiian Telcom has been exploring other product development opportunities, cost reduction initiatives, asset rationalization, capital raising opportunities and debt reduction options to improve cash flow and liquidity.

K&E 13599326.13

PHIL1 817784-1

## B. Balance Sheet Restructuring Initiatives

39.    On September 16, 2008, Hawaiian Telcom announced that it had engaged the services of Lazard Frères & Co. LLC ("Lazard") as its financial advisor to assist in exploring restructuring alternatives.  Such alternatives included Lazard's efforts to facilitate a conversion of existing debt into equity or to raise additional equity capital, from both existing and third-party investors, or to explore the viability of a sale of all or substantially all of Hawaiian Telcom's assets.

40.    Shortly after Hawaiian Telcom hired Lazard, Hawaiian Telcom undertook efforts to reach out to the lenders under the Credit Agreement and holders of the Notes.  With Hawaiian Telcom's assistance, both the Bank Group and the Ad Hoc Noteholder Committee organized and retained professional advisors.  Throughout the past three months, Lazard has facilitated discussions between Hawaiian Telcom, the Bank Group and the Ad Hoc Noteholder Committee, as well as discussions with The Carlyle Group, regarding potential new money investments. Both the Ad Hoc Noteholder Committee and The Carlyle Group expressed interest in making such an investment, and The Carlyle Group submitted a proposal for a conditional equity infusion into Hawaiian Telcom as part of a financial restructuring.

41.    Beginning in October 2008, Lazard began soliciting third-party investor interest in a potential financing and/or strategic investment transaction.  Lazard contacted approximately 12 institutions including four strategic investors and eight financial investors.  As of the date hereof, discussions are ongoing with certain of these third parties regarding potential restructuring options and a potential sale of all or substantially all of Hawaiian Telcom's assets.

42.    Hawaiian Telcom has shared the proposal from The Carlyle Group with, and has provided updates on the status of negotiations with third parties to, the advisors to the Bank

K&E 13599326.13

PHIL1 817784-1

Group. After several weeks of arms-length negotiations, and despite Hawaiian Telcom's good-faith efforts to reach an out-of-court arrangement with its various stakeholders, Hawaiian Telcom ultimately determined to commence the chapter 11 cases to, among other things, preserve the going-concern value of its businesses while it continues to explore its restructuring and asset sale options. Accordingly, on the date hereof, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

## Part IV

## Requests for Relief

43. The Debtors have filed or will file a number of motions and applications in these cases seeking orders granting various forms of relief. I believe the forms of relief requested are necessary to enable Hawaiian Telcom to operate with minimal disruption during the pendency of the chapter 11 cases. A description of the relief requested and the facts supporting each of the pleadings is set forth below.[7]

### A. Joint Administration Motion

44. As described above, the eight Debtors in these cases are Hawaiian Telcom Communications, Inc., Hawaiian Telcom Holdco, Inc., Hawaiian Telcom, Inc., Hawaiian Telcom Services Company, Inc., Hawaiian Telcom IP Service Delivery Investment, LLC, Hawaiian Telcom IP Service Delivery Research, LLC, Hawaiian Telcom IP Video Investment, LLC and Hawaiian Telcom IP Video Research, LLC. The Debtors operate as an integrated business with common ownership and control.

---

[7] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant motion or application.

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 16 of 44

45.     To the best of my knowledge, the joint administration of the chapter 11 cases will not adversely affect the Debtors' respective constituencies and will not harm parties in interest. Rather, all of these parties will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

**B.      Cash Collateral Motion**

46.     In the ordinary course of business, the Debtors use cash on hand and cash flow from operations to fund their business operations.  As described above, the lenders under the Debtors' Credit Agreement hold liens on substantially all of Hawaiian Telcom's assets pursuant to the Guarantee Agreement.  It is critical to the success of these chapter 11 cases for the Debtors to have continued access to this cash collateral.

**C.      Cash Management Motion**

**1.      Description of the Debtors' Cash Management System**

47.     In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect funds, transfer them to a concentration account and disburse them, through other accounts, to pay operating expenses (collectively, the "Cash Management System").

48.     As of the Petition Date, the Debtors maintain the following bank accounts (collectively, the "Bank Accounts") with four different banks—First Hawaiian Bank, Bank of Hawaii, JPMorgan Chase Bank and Wells Fargo (collectively, the "Banks"):

    (a)  Concentration Account:   The Debtors maintain a cash concentration
         account with First Hawaiian Bank (the "Concentration Account").   This
         account serves as the ultimate collection point for all funds moved into
         and through the Cash Management System.   The other First Hawaiian
         Bank accounts are zero balance accounts.   First Hawaiian Bank
         automatically sweeps the balance in these accounts to the Concentration
         Account on a daily basis.   In addition, the Debtors fund the Concentration
         Account with the proceeds of loans under the Credit Agreement, transfers

K&E 13599326.13

PHIL1 817784-1

from the Depository Accounts (defined below) and the Investment Account (defined below).

(b) <u>Depository Accounts</u>:  In the ordinary course of business, the Debtors deposit cash and checks received from customers into numerous depository accounts held at the Banks (the "<u>Depository Accounts</u>").  The Debtors also receive deposit receipts into the Depository Accounts through lockbox arrangements.  The lockboxes are Post Office Boxes at the U.S. Post Office.  The Debtors authorize the Banks to pick up mail from these P.O. Boxes as their agents.  The Banks process the check payment receipts included in this mail and deposit them into the Depository Accounts.  In addition, the Depository Accounts include amounts from processed credit card payments, wire transfers and ACH remittance from customers and other miscellaneous type cash receipts. The Debtors currently sweep or transfer the amounts in the Depository Accounts into the Concentration Account on a daily basis (for the depository accounts that are zero balance accounts), bi-weekly basis (for some depository accounts via wire transfer) or monthly basis (for other depository accounts via wire transfer).

(c) <u>Payroll Account</u>:  The Debtors maintain one payroll account (the "<u>Payroll Account</u>") at First Hawaiian Bank.  The Debtors fund the Payroll Account with funds from the Concentration Account as they process each week's payroll to pay net wages.

(d) <u>Accounts Payable Expense Accounts:</u>  As a general matter, the Debtors pay accounts payable, payroll taxes, wage garnishments, sales and use taxes and other expenses from various zero-balance expense accounts held at First Hawaiian Bank (the "<u>Expense Accounts</u>").  The Debtors fund the Expense Accounts with amounts from the Concentration Account, as needed.

(e) <u>Investment Account</u>:  The Debtors maintain one account (the "<u>Investment Account</u>") at Wells Fargo Advantage Funds for the periodic investment of excess cash balances in the Concentration Account that exceed the Debtors' projected daily operating requirements.   The investment objectives for the Investment Account are described below.

(f) <u>Principal and Interest Disbursement Accounts:</u>  The Debtors maintain an account at First Hawaiian Bank to make principal and interest payments due under the Debtors' senior secured credit facility.  The Debtors also use the account for swap settlements and other expenses.  The Debtors also maintain an account at JPMorgan Chase Bank to make principal and interest payments on the Senior and Subordinated Notes. The Debtors fund these accounts by wire from the Concentration Account.

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 18 of 44

49.     To the best of my knowledge, the Cash Management System provides numerous benefits, including, without limitation, the ability to: (a) quickly create status reports on the location and amount of funds, which allows management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating and tracking movement of funds. Indeed, the Debtors maintain current and accurate accounting records of all daily cash transactions.

### 2.     The Debtors' Existing Business Forms

50.     In the ordinary course of business, the Debtors use numerous varieties of business forms. To minimize expenses to the estates and avoid confusion on the part of employees, customers and suppliers, the Debtors seek authority to continue to use all correspondence and business forms as such forms were in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms. The Debtors will replace their existing stock of business forms with new forms identifying their status as debtors in possession as existing forms are depleted. With respect to checks, which the Debtors print themselves, the Debtors will begin printing these checks with a "Debtor in Possession" designation within four days of the Petition Date.

### 3.     The Debtors' Investment Practices

51.     The Debtors adhere to certain prudent investment practices with regard to the Cash Management System (the "Investment Practices"), which have the primary goal of protecting principal and a secondary goal of maximizing stability and liquidity. The Debtors have determined, in their business judgment, that it is desirable to maintain their excess cash in income producing investments to the fullest extent possible. As part of their Cash Management

19

System, the Debtors retain their excess cash in their Investment Account and invest such cash in investment-grade fund instruments with ratings of AAA/Aaa or equivalent, U.S. Treasury obligations or U.S. Government obligations (either issued or guaranteed by the U.S. Treasury or U.S. Government). The maturity of such temporary investments can be no longer than one year. Being highly liquid and conservative, such temporary investments allow the Debtors to earn interest income without tying up operating cash. As Hawaiian Telcom's Chief Financial Officer, I approve the funds into which the Debtors invest.

52. The Debtors invest excess operating cash in, and withdraw cash needed for operations from, the approved investment funds on an as-needed basis. Either the Debtors' VP Finance/Controller or I, as Chief Financial Officer, must approve each transfer to or from an investment fund. All transfers into and out of the Investment Account flow to or from the Concentration Account.

### D. Wages and Benefits Motion

53. The Debtors currently employ approximately 1,450 employees (collectively, the "Employees"). The Debtors employ approximately 571 Employees (39%) on a salaried basis (the "Salaried Employees") and approximately 879 Employees (61%) on an hourly basis (the "Hourly Employees"). The International Brotherhood of Electrical Workers, Local 1357 (the "IBEW"), represents approximately 863 of the 879 Hourly Employees (the "Union Hourly Employees").

54. In addition, the Debtors supplement their workforce with seven independent contractors (the "Independent Contractors") and approximately 50 temporary employees through employment agencies (the "Temporary Employees").

K&E 13599326.13

PHIL1 817784-1

### 1. Wages, Salaries and Compensation

#### a. Wage and Commission Obligations

55. The Debtors pay the Hourly Employees and the Salaried Employees on a bi-weekly basis. The Debtors pay the Hourly Employees one week in arrears, and Salaried Employees on a current basis. The Debtors' weekly payroll obligations generally include wages, salaries and overtime compensation, as applicable.

56. In the ordinary course of business, as an integral component of compensation for sales and marketing Employees, the Debtors offer a commission program (the "Commission Program"). Unlike annual bonus programs and similar programs, Employees count on the commissions earned under the Commission Program as part of their salary. Commissions are typically earned when the Employee attains a goal under an annual sales plan. Such goals may relate to sales quotas, sales of certain products or sales to certain customer groups, which generate recurring revenue by migration of products, contracts and services. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Commission Program.

57. On average, the Debtors' gross payroll totals approximately $3.8 million per bi-weekly period and may vary due to increased overtime costs incurred during the Hawaii rain season, which runs approximately from November to March. The Debtors estimate they owe approximately $1.6 million on account of accrued wages, salaries and other compensation (excluding reimbursable expenses and vacation pay) earned prior to the Petition Date (the "Unpaid Compensation"). The Debtors do not believe they owe any Employee Unpaid Compensation in excess of the $10,950 cap imposed by section 507(a)(4) of the Bankruptcy Code.

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 21 of 44

### b. Gross Pay Deductions, <ins>Governmental Withholdings and Payroll Taxes</ins>

58.     The Debtors routinely deduct certain amounts from paychecks, including, without limitation, (a) garnishments, child support, union dues and service charges and similar deductions and (b) other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions and miscellaneous deductions) (collectively, the "<ins>Deductions</ins>").  On average, the Debtors deduct approximately $520,000 from Employees' paychecks per bi-weekly pay period.   As of the Petition Date, the Debtors estimate they have collected approximately $255,000 on account of these Deductions.   The Debtors remit these Deductions to the appropriate third-party recipients.  The Debtors, however, may not have forwarded certain of the Deductions to the appropriate third-party recipients prior to the Petition Date.  Accordingly, the Debtors seek authority to forward prepetition Deductions (and to continue to forward Deductions on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

59.     In addition to the Deductions, federal and state laws require the Debtors to withhold amounts related to federal, state and local income taxes, as well as Social Security and Medicare taxes, for remittance to the appropriate federal, state or local taxing authority (collectively, the "<ins>Withheld Amounts</ins>").  Further, federal and state laws require the Debtors to deduct additional amounts for federal and state unemployment insurance (the "<ins>Employer Payroll Taxes</ins>," and together with the Withheld Amounts, the "<ins>Payroll Taxes</ins>").  In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately

$970,000 per bi-weekly pay period. As of the Petition Date, the Debtors estimate they owe approximately $400,000 on account of prepetition Payroll Taxes.

### c. Independent Contractors' Compensation

60. The Debtors employ seven Independent Contractors, who provide accounting, systems programming, government contracting, vendor negotiation and management consulting services to the Debtors. The Debtors remit compensation to the Independent Contractors (the "Independent Contractor Compensation") through their accounts payable process. On average, the Debtors pay a total of approximately $165,000 per month to Independent Contractors. The Debtors do not believe they owe any Independent Contractor more than $10,950 on account of prepetition obligations.

### d. Temporary Employee Compensation

61. The Debtors employ approximately 50 Temporary Employees to handle projects or overflow workflow, including systems programming, billing analysis, clerical work, circuit design, collections, network operations administration, information technology support and food service. The Debtors typically remit compensation on a weekly basis for the Temporary Employees' services (the "Temporary Employee Compensation") to the employment staffing agencies that refer such Temporary Employees through their accounts payable process. On average, the Debtors pay approximately $230,000 per month on account of Temporary Employees. As of the Petition Date, the Debtors estimate they owe Temporary Employees (or their respective agencies) approximately $200,000 for prepetition services. The Debtors do not believe they owe any Temporary Employee (or his/her staffing agency) more than $10,950 on account of prepetition obligations.

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 23 of 44

### e. Outstanding Payments to Employees, Independent Contractors and Temporary Employees

62.     Certain Employees, Independent Contractors and Temporary Employees may be entitled to Unpaid Compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid and (b) some payroll or invoice checks issued prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date. The Debtors seek the authority to honor any such payments.

### 2. Reimbursable Expenses

63.     In the ordinary course of business, the Debtors reimburse Employees (as well as members of the Debtors' boards of directors) for certain expenses incurred in the scope of their employment (or board service) and on behalf of the Debtors (collectively, the "Reimbursable Expenses"), including housing expenses and business-related travel expenses. In the aggregate, the Debtors' Employees and directors incur, on average, approximately $50,000 per month in Reimbursable Expenses. The Debtors pay monthly housing expenses for certain Employees on the first payday of the month; accordingly the Debtors will not owe any prepetition amount on account of housing expenses as of the Petition Date. Typically, the Debtors reimburse each Employee's non-housing Reimbursable Expenses directly by automatic clearing house payment after online processing and approval. Although the Debtors request Employees and directors to submit reimbursement requests promptly, not all of the Employees and directors do so. Based on historical figures, the Debtors estimate they owe approximately $25,000 on account of prepetition Reimbursable Expenses as of the Petition Date.

K&E 13599326.13

PHIL1 817784-1

### 3. Employee Benefits

64. In the ordinary course of business, the Debtors maintain various employment benefit plans and policies, including, without limitation, health care, dental and vision plans, workers' compensation benefits, vacation time and other paid leaves of absence, 401(k) retirement savings plans, flexible benefit plans, life insurance, accidental death and dismemberment insurance, short- and long-term disability insurance and business travel accident insurance (the "Employee Benefit Program").

### a. Medical, Vision and Dental Plans

65. All Employees who regularly work at least 20 hours per week, Temporary Employees who have completed six months of continuous service and whose tenure is extended by at least six months thereafter, and retired Employees (the "Eligible Employees"), and their dependents, are eligible to receive medical, vision and dental insurance (the "Health Care Plan"), including prescription drug coverage. The following is a brief summary of each Health Care Plan:

(a)  Medical and Vision Plan.  Through Hewitt Associates, the Debtors offer Eligible Employees Hawaii Medical Service Association and Kaiser Permanente HMO and PPO medical and vision plans, which include prescription drug coverage (the "Medical and Vision Plans").  The Debtors pay approximately $800,000 per month on account of the Medical and Vision Plans, net of Employee contributions.  As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of Medical and Vision Plan obligations.

(b)  Dental Plan.  Hawaii Dental Service and MetLife, Inc. administer the Debtors' dental plans.  The Debtors pay approximately $81,000 per month to administer these plans.  The Debtors prepay these premiums on a monthly basis.  As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the dental plans.

66. Currently, the Debtors provide medical and vision care coverage, including prescription drug coverage, to 863 Union Hourly Employees, 514 non-union Employees and 303

K&E 13599326.13
PHIL1 817784-1

retired Employees, and dental care to 863 Union Hourly Employees and 518 non-union Employees. The Debtors' Health Care Plan also covers four former Employees through February 2009, pursuant to their severance agreements.

### b. Flexible Benefit Plans

67. The Debtors also offer Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care premiums and expenses (the "Flexible Benefit Plan"). Benefits Service of Hawaii, Inc. administers the Flexible Benefit Plan. Currently, approximately 209 Employees participate. The administration of this Flexible Benefit Plan costs the Debtors approximately $1,200 per month. The Debtors withhold approximately $25,000 per month on account of Employee contributions to the Flexible Benefit Plan. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of administrative costs relating to the Flexible Benefit Plan, and have collected approximately $25,000 in Employee contributions to the Flexible Benefit Plan.

### c. Workers' Compensation

68. The Debtors provide workers' compensation insurance for their Employees at the statutorily-required level (the "Workers' Compensation Program"). In addition, as part of the Workers' Compensation Program and pursuant to a collective bargaining agreement, Union Hourly Employees may receive extended workers' compensation benefits beyond the statutory requirements for up to 39 weeks and beyond, subject to a medical examination. First Insurance Company of Hawaii administers and pays workers' compensation claims through an incurred loss program with a $1 million liability limit per accident per each Employee. The Debtors' annual insurance premiums and fees for workers' compensation insurance is approximately

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii  #08-02005  Dkt # 19  Filed  12/22/08  Page 26 of 44

$940,000 in the aggregate for the policy period May 2, 2008 through May 2, 2009. The premium includes a Terrorism Risk Insurance Act premium of approximately $34,000 for Union Hourly Employees insured pursuant to a collective bargaining agreement. The Debtors prepay these premiums. The Debtors pay First Insurance Company of Hawaii, Ltd. ("First Insurance") to manage Workers' Compensation due under the Family Medical Leave Act; however, as of the Petition Date, the Debtors do not owe any prepetition amounts to First Insurance.

### d.     **Vacation, Short-Term Leave and Leaves of Absence**

69. <u>Vacation</u>. The Debtors provide paid vacation time to their Employees beginning after one full month of service (the "<u>Vacation Time</u>"). The amount of Vacation Time available to a particular Employee ranges from two to five weeks and is generally determined by the Employee's length of service. Vacation Time accrues to the Employee on a monthly basis, but is advanced to the Employee on January 1 of each year. If an Employee leaves the Debtors' employ, whether voluntarily or involuntarily, his or her accrued and unused Vacation Time, if any, will be calculated and paid out in a final paycheck. As of the Petition Date, the Debtors have accrued approximately $6.1 million on account of unused Vacation Time. This amount, however, is not a current cash payment obligation as Employees only are entitled to be paid for accrued and unused Vacation Time in the event the Employees leave the Debtors' employ.

70. <u>Short-Term Leave</u>. In addition, in the ordinary course of business, Employees may be eligible for paid short-term leave for illness, injury or other emergency situations (the "<u>Short-Term Leave</u>"). The amount of Short-Term Leave available varies by type of Employee and length of employment. The Debtors do not accrue Short-Term Leave for their Employees and such leave is not reflected as a liability on the Debtors' balance sheet.

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 27 of 44

71.     Leaves of Absence.  The Debtors also allow their Employees to take certain other leaves of absence for personal reasons, many of which are required by law (the "Leaves of Absence").  Leaves of Absence include family, school, partnership leave, family medical leave, family care leave, pregnancy leave, bereavement leave, military leave and, for Hourly Union Employees, leave for union business.  The Debtors do not accrue Leaves of Absence for their Employees and do not reflect Leaves of Absence as a liability on their balance sheet.

### e.     Retirement Savings Plans

72.     The Debtors maintain a retirement savings plan for the benefit of all eligible Employees meeting the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").  Approximately 789 Union Hourly Employees and 532 other Employees currently participate in the 401(k) Plan, and the approximate bi-weekly amount withheld from such Employees' paychecks for 401(k) contributions is $340,000.  The Debtors have established a limited matching program to induce eligible Employees to participate in the 401(k) Plan (the "Matching Obligation").  The Debtors' Matching Obligations vary depending on whether the IBEW represents the Employee.  On average, the Debtors pay approximately $265,000 per bi-weekly pay period on account of Matching Obligations.  The Debtors pay Fidelity Investments a quarterly fee of approximately $5,500 to administer the 401(k) Plan.

73.     As of the Petition Date, the Debtors are holding approximately $114,000 in 401(k) contributions that have been withheld from participants' paychecks and owe approximately $85,000 on account of Matching Obligations.  The Debtors estimate they owe Fidelity Investments approximately $12,500 in administrative fees as of the Petition Date.

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 28 of 44

### f.  Life, Disability and Accident Insurance

74.     The Debtors provide all Employees with term life and accidental death and dismemberment insurance coverage through MetLife, Inc. (the "Life and AD&D Insurance"). On average, this coverage costs the Debtors approximately $14,000 per month.  The Debtors prepay these premiums on a monthly basis.  Accordingly, to the best of the Debtors' knowledge, no payments are outstanding on account of the Life and AD&D Insurance as of the Petition Date.

75.     In addition, the Debtors provide all Employees with disability benefits through MetLife, Inc. (the "Disability Benefits").  Disability Benefits are voluntary and Employees prepay their premiums on a monthly basis.  Accordingly, to the best of the Debtors' knowledge, the Debtors do not owe any prepetition amounts on account of Disability Benefits as of the Petition Date.

76.     The Debtors also offer business travel accident insurance through Marsh USA to all Employees who travel to conduct business on the Debtors' behalf.  The Debtors paid the $15,000 annual premium at the March 2008 commencement of the policy period.  As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of business travel accident insurance.

### g.  Tuition Assistance

77.     The Debtors also maintain a tuition assistance program, available to Employees who enroll in an approved educational program.  All Union Hourly Employees are eligible upon six months of employment and have no cap on their benefit.  Other Employees are eligible upon hire, but have a $5,000 annual cap on their benefit.  Prior to the Petition Date, there were approximately 40 Employees participating in the tuition assistance program at a total cost to the

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 29 of 44

Debtors of approximately $11,000 per month. The Debtors believe there is approximately $60,000 outstanding on account of the tuition assistance program.

### h. Employee Assistance

78. Because personal problems can have an impact on an employee's effectiveness at work, the Debtors make professional counseling and treatment services available to Employees and their immediate family members through an employee assistance referral program. These programs cost the Debtors approximately $2,700 per month. As of the Petition Date, the Debtors estimate they owe approximately $3,000 on account of the employee assistance referral program.

### i. Employee Referral Award Program

79. The Helping Everyone Excel Program ("HE'E") is designed to increase the sale of products through Employee referrals. Once the referral is turned into a completed order and the customer retains the product and/or service for over 30 days, the Debtors award the referring Employee points that can be redeemed for prizes and travel awards. On average, HE'E costs the Debtors approximately $4,000 per month.

### j. Employee Concession Discounts

80. Through a product purchase plan, the Debtors offer their products and services to active and retired Employees at discounted prices based upon length of service and the particular product or service. This program generates monthly revenues of approximately $30,000. To the best of the Debtors' knowledge, the Debtors do not owe any amounts as of the Petition Date on account of the employee discount program.

### E. Customer Programs Motion

81. To maintain the loyalty and goodwill of their customers, in the ordinary course of business and consistent with industry practice, the Debtors have implemented customer-related programs (collectively, the "Customer Programs") to attract new customers, enhance customer

30

satisfaction, sustain goodwill and ensure that the Debtors remain competitive. The Customer Programs can generally be categorized as follows: (a) promotional offers; (b) billing discounts and adjustments; (c) returns, exchanges and store credit; and (d) deposit refunds. The following paragraphs describe the Debtors' most significant Customer Programs in greater detail.

### 1.    Promotional Offers

82.    The Debtors utilize promotional offers to attract and retain business and residential customers, as well as to stimulate increased usage of the services offered to customers. With regard to business customers, the Debtors offer the following promotions, among others:

> (a)    *Integrated Services Digital Network ("ISDN") Services PRI Flat Rate and Optional Measured Data Services Promotion.* This is a discount plan for a digital networking service that combines voice and ISDN data capabilities. The discount plan waives certain nonrecurring charges and offers monthly discounts on recurring charges. New business customers and certain existing business customers are eligible for the program. The Debtors do not believe they have any outstanding prepetition obligation on account of this program.

> (b)    *Hawaiian Telcom Business Choice$^{SM}$ Bundled Service Option.* Under this Customer Program, customers, who purchase multiple services such as internet, voice and long distance services, receive a discount on the overall price of such services. Business customers with qualifying plans and qualifying lines are eligible to participate in this discount plan. The Debtors do not believe they have any prepetition obligation on account of this program.

In addition, the Debtors offer customized promotional offers to individual business customers, which vary by each customer's needs.

83.    With regard to residential customers, the Debtors offer the following promotions, among others:

> (a)    *HSI $19.99 for Life Promotion.* Under this discount plan, residential customers receive HSI at a fixed price of $19.99 for the

K&E 13599326.13

PHIL1 817784-1

entire period they remain a customer of the Debtors. This promotion is no longer offered to new or existing residential customers, but the Debtors seek to honor their agreement with customers that are already enrolled. The Debtors do not believe they have any prepetition obligation on account of this program.

(b) *HSI 90-Day Money Back Guarantee* (the "Money Back Guarantee"). Under this refund plan, customers who sign up for 3MB, 7MB or 11MB service have the ability to cancel at any point within the first 90 days of their service activation and receive a full credit or refund. With respect to the Money Back Guarantee, the Debtors estimate a monthly expense of approximately $10,000.

(c) *MyChoice Bundles*. Under this Customer Program, customers, who purchase multiple services such as internet, voice and long distance services, receive a discount on the overall price of such services. The Debtors do not believe they have any prepetition obligation on account of this program.

In addition, the Debtors currently offer discounts to previous customers that rejoin the Debtors' service. Because the Debtors offer discounted rates only under this promotional Customer Program (as opposed to cash back, refunds or exchanges), the Debtors do not believe they have any outstanding prepetition obligation on account of this program.

## 2. Billing Discounts and Adjustments

84. One of the Debtors' goals is to provide excellent service to its customers. When customers call the Debtors' customer service hotlines with questions, comments, service changes or complaints, the Debtors' customer service representatives have discretion to credit a customer's account or offer the customer a future discount on new or existing products or services. The customer service representatives will evaluate the customer's request by reviewing account and usage data and ensure the customer's needs are met either by: (a) satisfying an outstanding issue; (b) offering a discount on a customer's existing product or service; or (c) offering a new product or service to the customer. In addition, the Debtors routinely issue credits or refunds for reimbursement of overpayments made by customers that are the result of either

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii  #08-02005  Dkt # 19  Filed  12/22/08  Page 32 of 44

customer errors or billing errors. The Debtors estimate they may owe customers approximately $500,000 in the aggregate on account of billing credits agreed to prior to the Petition Date and approximately $5 million in refunds accrued, but unpaid as of the Petition Date. The Debtors do not believe they have any prepetition obligations on account of product or service discounts.

### 3. Returns, Exchanges and Store Credit

85.     To accommodate their customers' needs, and consistent with industry practices, the Debtors traditionally maintain return, refund and exchange policies. Generally, customers may return products in resalable condition within 30 days of the purchase date, depending on the terms of sale. Customers may exchange defective products for a new product of like kind within 90 days of the purchase date. These policies provide the Debtors' customers with comfort that they will be treated fairly and receive functioning equipment. While it is difficult to estimate Hawaiian Telcom's potential liability on account of returned or exchanged goods, the Debtors typically incur costs of approximately $75,000 per month with respect to these Customer Programs.

### 4. Deposit Refunds

86.     In the ordinary course of operating its businesses, the Debtors collect deposits from customers with poor or no credit to secure payment for certain services provided by the Debtors. Generally, after one year of service or when a customer cancels service for which a deposit was made, the Debtors return the customer's deposit, or the remaining monies of such deposit after applying it against any outstanding balance in the customer's account. As of the Petition Date, the Debtors estimate potential deposit refunds to be approximately $80,000.

33

### F. Shippers and Liens Motion

#### 1. Outstanding Orders

87.     Prior to the Petition Date, and in the ordinary course of business, the Debtors ordered approximately $6 million of goods for which delivery will not occur until after the Petition Date.  I believe it is important to the Debtors' efforts to transition smoothly into these chapter 11 cases to pay these claims in the ordinary course of business as administrative expense claims.

#### 2. Shippers

88.     In the ordinary course of business, the Debtors' suppliers ship goods, such as cable, maintenance equipment, tools and other supplies (collectively, the "Goods"), to the Debtors' main location in Honolulu, Hawaii.  The Debtors then redistribute these Goods as necessary to the Debtors' 87 central offices and six warehouses located throughout the Hawaiian Islands.  To ensure the timely delivery of these Goods and to enable the Debtors to service their customers' needs as efficiently as possible, the Debtors rely extensively on the services of shippers, truckers and other carriers (collectively, the "Shippers").

89.     I believe the Shippers that ship Goods to the Debtors from the continental United States and foreign countries are vital to the Debtors' businesses as many of these materials, tools and equipment are not generally available from local sources.  In the ordinary course of business, the Debtors use approximately 13 Shippers for interstate and international shipping.

90.     Likewise, the services provided by the Shippers who distribute material, equipment and tools from Honolulu to the Debtors' locations throughout the Hawaiian Islands are essential to the Debtors' ability to resolve network issues effectively and to provide excellent service to customers.  In the ordinary course of business, the Debtors use approximately 20

K&E 13599326.13

PHIL1 817784-1

Shippers for inter-island shipments.[8]  Of the 20 Shippers, one Shipper makes inter-island deliveries on a weekly basis, while the other inter-island Shippers make rush deliveries as needed.

91.    In connection with shipping costs, the Debtors are also required to pay:  (a) vendor charges for shipping and handling; (b) packaging services; (c) trucking services; (d) logistics services; and (e) expeditor fees and costs (collectively, the "Associated Shipping Costs").  For 2008, on average, the Debtors paid 20 Shippers approximately $35,000 per month and the Debtors paid approximately $95,000 per month on account of Associated Shipping Costs.  The Debtors estimate that, as of the Petition Date, the outstanding prepetition invoices of the Shippers (inbound and inter-island) and Associated Shipping Costs total approximately $50,000.

### 3.    Materialmen's Lien Claimants

92.    The Debtors are involved in a number of construction projects relating to the development and maintenance of the Debtors' infrastructure and facilities.  Specifically, the Debtors have engaged contractors for a variety of services including:  (a) engineering, construction, installation and maintenance and repair of facilities; (b) roofing, exterior waterproofing and installing, repairing and maintaining heating and cooling systems; (c) inspecting, servicing, installing, removing and repairing underground fuel storage tanks, fuel dispensing equipment and related components in accordance with government regulations relating to excavating, grading and trenching; (d) building and managing projects involving installation of fabricated or premanufactured sheetmetal products (e.g., ductwork, flashings,

---

8    The Debtors use a total of 22 Shippers because most Shippers provide interstate, international and inter-island services.

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 35 of 44

gutters) and providing related piping controls and instrumentation; (e) providing materials, methods, schedules, reports, drawing and specifications for certain projects; (f) providing equipment necessary for completion of certain projects; (g) performing architectural work including space planning, construction drawings, project management and consulting; and (h) engaging in projects involving conduits and manholes, concrete, support structures, electrical work, site preparation and outside plant electrical engineering services. In addition, the Debtors occasionally send equipment offsite for maintenance.

93.     As of the Petition Date, the Debtors owe approximately $2.3 million to Materialmen's Lien Claimants on account of prepetition services rendered (the "Materialmen's Lien Claims").

### G.     Taxes and Fees Motion

94.     In the ordinary course of business, the Debtors:  (a) collect a state general excise tax (the "State Excise Tax") from their customers for remittance to the Hawaii taxing authority; (b) collect a federal excise tax (the "Federal Excise Tax," together with the State Excise Tax, the "Excise Taxes") from their customers for ultimate remittance to federal taxing authorities; (c) incur use taxes from the out-of-state purchase of goods and equipment for future remittance to state tax authorities (the "Use Taxes"); (d) pay permit and license fees (the "Licensing Fees"); (e) pay various regulatory fees and taxes (the "Regulatory Fees") to the relevant regulatory agencies and authorities; and (f) remit a public service company tax for regulated services to the Hawaii taxing authority (the "HPSC Tax," together with the Regulatory Fees and Licensing Fees, the "Fees").  The Debtors pay Excise Taxes, Use Taxes and Fees to the respective federal, state and local authorities (collectively, the "Authorities"), in each case, according to a remittance schedule as required by applicable laws and regulations.

36

### 1.   State Excise Tax

95.   The State of Hawaii levies a State Excise Tax based on a fixed percentage of charges related to the Debtors' non-regulated services and related sale of equipment.  The State Excise Tax differs from a traditional sales tax in that the Debtors can pay the tax out of pocket or pass on the State Excise Tax to their customers in the form of increased fees.  The Debtors collect the State Excise Tax from their customers and remit such tax to the Hawaii taxing authority on a monthly basis in arrears.  From January 2008 through September 2008, the Debtors collected from customers an average of $542,898 per month in State Excise Taxes.  As of the Petition Date, the Debtors estimate they owe State Excise Taxes for the period from November 1, 2008 through the Petition Date in the approximate amount of $550,000.

### 2.   Federal Excise Tax

96.   The Debtors also collect and remit a Federal Excise Tax to the Internal Revenue Service.  The Internal Revenue Service derives the Federal Excise Tax as a fixed percentage of charges related to local telephone service.  The Debtors remit these taxes bi-monthly on the 10th and 25th of every month.  Payments made on the 10th cover taxes incurred in the first half of the prior month, and payments made on the 25th cover taxes incurred in the second half of the prior month.  From January 2008 through September 2008, the Debtors have collected and remitted an average of $456,867 per month in Federal Excise Taxes.  As of the Petition Date, the Debtors estimate they owe Federal Excise Taxes for the period between November 1, 2008 and the Petition Date in the approximate amount of $465,000.

### 3.   Use Tax

97.   In the ordinary course of business, the Debtors purchase equipment and/or services from out-of-state vendors who do not charge the Debtors the State Excise Tax in

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed   12/22/08   Page 37 of 44

connection with such purchases. Accordingly, the Hawaii taxing authority requires the Debtors to pay Use Taxes with respect to such goods or services in an amount equal to the State Excise Tax that they otherwise would have paid had they purchased the goods in-state. From January 2008 through September 2008, the Debtors have remitted an average of $53,723 in Use Taxes per month. The Debtors pay Use Taxes at the end of each month on account of Use Taxes incurred for the previous month. As of the Petition Date, the Debtors estimate they owe Use Taxes incurred during the period from November 1, 2008 through the Petition Date in the approximate amount of $60,000.

### 4. Permits and Licensing Fees

98. As a publicly regulated utility, state and local laws require the Debtors to obtain certain permits and licenses to conduct their businesses in Hawaii. The method for calculating amounts due for such licenses and permits, and the deadlines for paying such amounts, varies by type of license or permit. As of the Petition Date, the Debtors believe they are current with respect to payments related to Licensing Fees and do not have any accrued and unpaid Licensing Fees relating to the prepetition period.

### 5. Regulatory Fees and HPSC Tax

99. In the ordinary course of business, the Debtors pay mandatory Regulatory Fees to the FCC and HPUC, including the following:

(a) Universal Service Fund Fees: The FCC uses these fees to subsidize phone service for low-income households, rural areas and schools and libraries. The Debtors pay these fees monthly, and, in 2008, have averaged $750,000 per month. As of the Petition Date, the Debtors estimate they owe Universal Service Fund Fees for the period between November 1, 2008 and the Petition Date in the approximate amount of $786,000.

(b) Telecommunication Relay Service ("TRS"): The FCC and HPUC use these fees to fund services for hearing impaired subscribers. The Debtors

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed   12/22/08   Page 38 of 44

pay these fees monthly and, in 2008, federal TRS fees have averaged $89,000 per month and state TRS fees have averaged $17,000 per month.

(c) <u>HPUC Fees</u>: The HPUC uses these fees to fund the HPUC's regulatory and administrative activities. The Debtors pay these fees semi-annually and these fees average $610,000 per payment. As of the Petition Date, the Debtors believe there is $610,000 outstanding on account of HPUC Fees.

(d) <u>FCC Fees</u>: The FCC uses these fees to fund its regulatory and administrative activities. The Debtors pay these fees annually and these fees average $305,000 per year.

(e) <u>North American Numbering Plan</u>: This is a fee paid to the agency responsible for dispensing telephone numbers throughout North America. The Debtors pay this fee annually and this fee totals $6,000 per year.

(f) <u>Hawaii Public Service Company Tax (the "HPSC Tax")</u>: The State of Hawaii and its counties tax all designated public service companies for regulated local services. The Debtors remit HPSC Taxes monthly based on their estimated tax liability for the year, and, from January 2008 through September 2008, the average monthly HPSC Tax paid to the state of Hawaii and the counties of Hawaii, Honolulu, Kauai and Maui was $1,100,000. As of the Petition Date, the Debtors do not believe that there are any amounts owing in regards to the HPSC Taxes.

(g) <u>Emergency 911 Fees ("E911")</u>: The Hawaiian city and county authorities use these fees to pay for 911 emergency services. The Debtors pay these fees monthly as a fixed amount per wireless telephone access line and from January 2008 through August 2008, the average monthly E911 fee was approximately $7,300. The Debtors estimate they owe E911 fees for the period from November 1, 2008 through the Petition Date in the approximate amount of $6,000.

**H.    Utilities Motion**

100.    In the ordinary course of their businesses, the Debtors incur utility expenses for gas, water, sewer, electric and other similar utility services. Approximately 26 utility providers (collectively, the "<u>Utility Providers</u>") provide these services through approximately 820 accounts. On average, the Debtors spend approximately $2.1 million each month on utility costs.

39

101.    Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of these chapter 11 cases. I believe that, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations.

### I.    NOL Preservation Motion

102.    As of December 31, 2008, the Debtors expect to have net operating losses equal to approximately $360 million, and to have net unrealized built-in losses in their assets and certain other tax and business credits in excess of $200 million. To the best of my knowledge, these tax attributes are an extremely valuable asset of the Debtors' estates whose availability will facilitate the Debtors' successful reorganization and serve to improve creditor recoveries. As such, I believe it is appropriate to establish procedures to limit the trading of secured claims against the Debtors so as to protect these assets.

### J.    SOFAs/Schedules Extension Motion

103.    The Debtors have over four thousand potential creditors. The conduct and operation of the Debtors' business operations require them to maintain voluminous records and complex accounting systems. As a result of the complexity and diversity of the Debtors' operations, the limited staff available to perform the required internal review of the Debtors' businesses and affairs and the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of the chapter 11 cases, the Debtors anticipate that they will not be able to complete the schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "Schedules and Statements") in the time required under Rule 1007(c) of the Federal Rules of Bankruptcy Procedure and Rule 1007-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware. Accordingly, I

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 40 of 44

believe it is in the Debtors' best interest to obtain an extension of eight days in addition to the time provided for under Local Bankruptcy Rule 1007-1(b) to file the Schedules and Statements, which would provide the Debtors with a total of 38 days after the Petition Date to file the Schedules and Statements.

### K.   Kurtzman Carson Consultants LLC Retention Motion

104.    The Debtors have proposed to engage Kurtzman Carson Consultants LLC to act as the Debtors' notice and claims agent, because this is an effective and efficient manner of providing notice to the thousands of creditors and parties in interest of the filing of the Debtors' chapter 11 cases and other developments in the chapter 11 cases, and of addressing other similar duties during these cases.

### L.   Kirkland & Ellis LLP Retention Application

105.    The Debtors seek to retain Kirkland & Ellis LLP ("K&E") as their attorneys because K&E has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.  K&E has been working with Hawaiian Telcom since August 2008 with respect to various restructuring and other related matters.

### M.   Klehr, Harrison, Harvey, Branzburg & Ellers LLP Retention Application

106.    The Debtors seek to retain Klehr, Harrison, Harvey, Branzburg & Ellers LLP ("Klehr Harrison") as their local counsel and conflicts counsel because Klehr Harrison has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.  Klehr Harrison has been working with Hawaiian Telcom since November 2008 with respect to various restructuring and other related matters.

41

### N.     Lazard Frères & Co., LLC Retention Application

107.     The Debtors seek to retain Lazard Frères & Co., LLC ("Lazard") as their financial advisor and investment banker because, among other things, Lazard has extensive experience and an excellent reputation in providing high quality financial advisory and investment banking services to debtors and creditors in bankruptcy reorganizations and other restructurings.  Lazard has been working with Hawaiian Telcom since September 2008 with respect to various restructuring and other related matters.

### O.     Zolfo Cooper Management, LLC Retention

108.     The Debtors seek to retain Zolfo Cooper Management, LLC ("Zolfo Cooper") as the Debtors' restructuring consultants.  Zolfo Cooper has been working with Hawaiian Telcom since January 2008 with respect to various restructuring and other related matters.

### P.     Ordinary Course Professionals Motion

109.     Hawaiian Telcom routinely retains various attorneys, accountants and other professionals (each, an "OCP").  The OCPs provide services for the Debtors in a variety of matters unrelated to these chapter 11 cases, including legal services with regard to specialized areas of the law, accounting services, auditing and tax services and certain consulting services. A list of the Debtors' current OCPs is attached to the OCP Motion as Exhibit B.

110.     Hawaiian Telcom also employs professional service providers such as consultants specializing in public relations, information technology, energy savings, environmental matters and telecommunications regulation (collectively, the "Service Providers").  Although some of the Service Providers have professional degrees and certifications, these parties—like other vendors, suppliers and service providers—provide services relating to the day-to-day operation of the Debtors' businesses.

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 42 of 44

111.   I believe that without the background knowledge, expertise and familiarity that the OCPs and Service Providers have relative to the Debtors and their operations, the Debtors would incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations.  Moreover, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' businesses.

*[Remainder of Page Intentionally Left Blank]*

K&E 13599326.13

PHIL1 817784-1

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 19   Filed  12/22/08   Page 43 of 44

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 1, 2008

Respectfully submitted,

Robert F. Reich
Senior Vice President, Chief Financial Officer
and Treasurer of Hawaiian Telcom
Communications, Inc.