# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | **Case No. 08-02005** |
| | (Chapter 11) |
| HAWAIIAN TELCOM COMMUNICATIONS, INC., et al.[1] | |
| Debtors and Debtors-in-Possession | **JUDGE: Honorable Lloyd King** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF CONFIRMATION OF JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HAWAIIAN TELCOM <u>COMMUNICATIONS, INC., AND ITS DEBTOR AFFILIATES</u>

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Hawaiian Telcom Communications, Inc. (0376); Hawaiian Telcom Holdco, Inc. (9868); Hawaiian Telcom, Inc. (9500); Hawaiian Telcom Services Company, Inc. (5722); Hawaiian Telcom IP Service Delivery Investment, LLC (9423); Hawaiian Telcom IP Service Delivery Research, LLC (9685); Hawaiian Telcom IP Video Investment, LLC (9295); and Hawaiian Telcom IP Video Research, LLC (9571). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 1177 Bishop Street, Honolulu, HI 96813.

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................1

FINDINGS OF FACT ....................................................................3

I. HAWAIIAN TELCOM BACKGROUND .............................3
   A. History And Background...................................................3
   B. Events Leading To The Chapter 11 Cases. .....................4
   C. Hawaiian Telcom's Restructuring Efforts. .....................5
      1. Hawaiian Telcom's Strategic Business Plan and Next Generation Television. ...............................6
      2. Out-Of-Court Efforts To Delever The Capital Structure............9
   D. The Chapter 11 Cases. ..................................................10
      1. The Cash Collateral Order. .....................................10
      2. Operations During Chapter 11. ...............................13
      3. Development Of The Plan.......................................13

II. THE PRIMARY CONTESTED ISSUES AT CONFIRMATION.........17
   A. The Debtors' Enterprise Value. ......................................18
      1. The Debtors' Range of Enterprise Value Is Reasonable. ........19
         (a) The Debtors' Range Of Enterprise Value Is Between $350 And $425 Million. ...............19
         (b) The Lazard Enterprise Value Range Is Consistent With Houlihan's Analysis. ............20
         (c) The Enterprise Value Range Is Consistent With The Market's View of Hawaiian Telcom. ..........20
      2. All Valuation Experts Utilized Common Enterprise Valuation Methodologies. ...................21
      3. Lazard Exercised Appropriate Judgment In Evaluating The Debtors' Enterprise Value. ...................22
         (a) Lazard Properly Accounted For Hawaiian Telcom's Performance Relative To Peer Companies. ...................22

ii

          (b)    Lazard's Valuation Is Supported By Hawaiian Telcom's Free Cash Flow Performance Metric............. 24

          (c)    Lazard's DCF Analysis Accounted For Hawaiian Telcom's Management's Projections Without Ignoring Market Risks. ................................................... 26

**B.**    **The Debtors Properly Valued The Unencumbered Assets........... 27**

    1.    The Debtors' Value For The Motor Vehicles Is Appropriate And Unchallenged. ............................... 28

    2.    The Debtors' Range Of Value For  Unencumbered Real Property Held In Fee Is Reasonable............................... 28

          (a)    The Debtors Reasonably Valued The Unencumbered Real Property At $31.7 Million............ 29

          (b)    The Debtors' And Secured Lenders Experts' Testimony On Easements Establish That They Have No Market Value. ................................... 30

          (c)    The Debtors Would Not Need To Move Off The Unencumbered Property. ............................... 35

    3.    The Evidence Of The Value Of The Encumbered Assets Is Not Necessary To The Court's Analysis Of The Debtors' Plan.................................................................. 37

**C.**    **Warrants Are An Appropriate Recovery Under The Plan........... 37**

    1.    Warrants Are An Appropriate Form Of Recovery For The Class 5 Claimants.............................................. 38

          (a)    The Bankruptcy Code Requires Value, Warrants Have Value Here............................................. 38

          (b)    Warrants Are Frequently Used in Chapter 11 Proceedings. .................................................. 39

    2.    The Debtors Preserve Substantial Tax Benefits From The Use Of Warrants Instead Of Common Stock.......................... 40

    3.    The Debtors Properly Valued The Warrants. ......................... 41

          (a)    The Black-Scholes Model Is The Proper Method To Value The Warrants.................................. 41

          (b)    Lazard Utilized A Reasonable Time Period To Determine The Value Of The Warrants. ...................... 41

**D.**    **The Debtors Properly Allocated Value To The Constituents. ...... 42**

    1.    Under The Debtors' Allocation Of Value, The Senior Noteholders Receive A Greater Recovery Than Required By The Bankruptcy Code.......................................... 43

          (a)    The Declining Value Of The Collateral. ...................... 45

    2.     Under The Alternative Methodology, The Senior Noteholders Receive A Greater Recovery Than Required By The Bankruptcy Code.............................................. 46

    3.     The General Unsecured Creditors' Recovery Is Appropriate............................................................. 47

**E.**   **The Compensation Programs Were Developed And Proposed In Good Faith.................................................... 48**

    1.     The Reserve of New Common Stock for the Management Equity Incentive Program Is Appropriate. ......... 49

    2.     The 2009 Incentive Program Is Appropriate. ........................... 49

**III.**   **THE PLAN COMPLIES WITH ALL NECESSARY STATUTORY PROVISIONS......................................... 51**

**A.**   **The Court Has Jurisdiction And The Debtors Are Eligible For Relief. ..................................................................... 51**

**B.**   **The Debtors' Plan Complies With Section 1129(a)(1) of the Bankruptcy Code.......................................................... 52**

    1.     Proper Classification (11 U.S.C. §§ 1122 And 1123(a)(1)). ........................................................... 52

    2.     Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).......... 55

    3.     Specified Impaired Classes (11 U.S.C. § 1123(a)(3)). ............ 55

    4.     No Discrimination (11 U.S.C. § 1123(a)(4)). ........................... 55

    5.     Implementation Of The Plan (11 U.S.C. § 1123(a)(5)). ........... 56

    6.     Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)). ........ 58

    7.     Designation Of Directors And Officers (11 U.S.C. § 1123(a)(7)). ........................................................ 58

    8.     Discretionary Contents Of The Plan (11 U.S.C. § 1123(b)). ........................................................... 59

        (a)    The Plan's Release, Injunction And Exculpation Provisions Are Appropriate. ......................... 59

        (b)    Section 1145 Waiver (11 U.S.C. § 1145). ...................... 61

**C.**   **The Debtors Are Proper Debtors (11 U.S.C. § 1129(a)(2))........... 62**

**D.**   **The Debtors Proposed The Plan In Good Faith (11 U.S.C. § 1129(a)(3))................................................................. 62**

**E.**   **Payment For Services Or Costs And Expenses (11 U.S.C. § 1129(a)(4)).............................................................. 64**

**F.**   **Directors, Officers And Insiders (11 U.S.C. § 1129(a)(5)). .......... 64**

**G.**   **No Rate Changes (11 U.S.C. § 1129(a)(6)). ................................. 66**

**H.**   **Best Interests Of Creditors (11 U.S.C. § 1129(a)(7))..................... 66**

**I.**   **Acceptance By Certain Classes (11 U.S.C. § 1129(a)(8)). ............. 69**

| | | | |
|---|---|---|---|
| J. | Treatment Of Claims Entitled To Priority Pursuant To Section 507(a) Of The Bankruptcy Code (11 U.S.C. § 1129(a)(9)) | | 69 |
| K. | Acceptance By At Least One Impaired Class (11 U.S.C. § 1129(a)(10)) | | 70 |
| L. | The Plan Is Feasible (11 U.S.C. § 1129(a)(11)). | | 70 |
| M. | Payment Of Bankruptcy Fees (11 U.S.C. § 1129(a)(12)). | | 72 |
| N. | Retiree Benefits (11 U.S.C. § 1129(a)(13)) | | 72 |
| O. | Non-Applicability Of Certain Sections (11 U.S.C. §§ 1129(a)(14), (15) and (16)) | | 72 |
| P. | The Debtors Complied With Section 1129(b) of the Bankruptcy Code. | | 73 |
| | 1. | The Plan Is "Fair and Equitable." | 73 |
| | 2. | There Is No Unfair Discrimination Under The Plan | 73 |
| Q. | Only One Plan (11 U.S.C. § 1129(c)) | | 75 |
| R. | Principal Purpose Of The Plan (11 U.S.C. § 1129(d)) | | 75 |
| S. | The Debtors' Plan Complies With Section 1127 Of The Bankruptcy Code. | | 75 |
| T. | The Debtors' Plan Complies With Section 1125 Of The Bankruptcy Code. | | 77 |
| **CONCLUSIONS OF LAW** | | | **81** |
| I. | BURDEN OF PROOF | | 81 |
| II. | THE DEBTORS PROPERLY ALLOCATED VALUE UNDER THE PLAN. | | 82 |
| III. | THE ADEQUATE PROTECTION PAYMENTS WERE WARRANTED | | 86 |
| IV. | GOOD FAITH | | 88 |
| V. | CRAM DOWN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE | | 89 |
| | A. | Unfair Discrimination | 89 |
| | B. | The Fair and Equitable Rule | 91 |
| VI. | CONCLUSION | | 93 |

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 5 of 99

# FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE COURT'S DECISION TO CONFIRM THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HAWAIIAN TELCOM COMMUNICATIONS, INC. AND ITS DEBTOR AFFILIATES

## <u>INTRODUCTION</u>

Hawaiian Telcom Communications, Inc. (together with its debtor affiliates, "<u>Hawaiian Telcom</u>," the "<u>Debtors</u>" or post-Effective Date, "<u>Reorganized Hawaiian Telcom</u>") filed its proposed chapter 11 plan of reorganization (the "<u>Plan</u>") on June 3, 2009. The Plan represents the culmination of extensive negotiations with the lenders under Hawaiian Telcom's prepetition secured credit facility (the "<u>Secured Lenders</u>," and, together with the counterparties to the swap agreements related thereto, the "<u>Secured Parties</u>").

The Plan is premised on the total enterprise value of $387.5 million calculated by Lazard Frères & Co., LLC ("<u>Lazard</u>") and a midpoint value for the unencumbered assets of $33.1 million.[2] Under the Plan, holders of Hawaiian Telcom's senior unsecured fixed rate and floating rate notes (collectively, the "<u>Senior Notes</u>" and the holders thereof, the "<u>Senior Noteholders</u>") stand to receive

---

[2] As discussed infra, the midpoint total distributable value is $460 million (after approximately $20 million in Effective Date payments to administrative and priority creditors and general unsecured creditors), which accounts for Hawaiian Telcom's projected cash on hand at emergence and the value of non-core assets. <u>See</u> ¶¶ 31-76.

warrants with a value of $12.3 million and holders of general trade claims will receive cash distributions in an aggregate amount not to exceed $500,000.

The official committee of unsecured creditors (the "Committee") does not support the Plan and at the confirmation trial argued four primary issues: (i) the total enterprise value of Hawaiian Telcom, (ii) the value of the Debtors' unencumbered assets, (iii) the value and utility of warrants provided to the Senior Noteholders, and (iv) the allocation of value between the Secured Parties and the unsecured creditors. In its objection to confirmation, the Committee also argued the Debtors did not propose the Plan in good faith.

Between November 9, 2009 and November 13, 2009, this Court held a trial to determine whether the Plan satisfies the requirements of section 1129 of title 11 of the United States Code (the "Bankruptcy Code") and, therefore, is confirmable. Hawaiian Telcom called 10 witnesses, each of whom testified in support of the Plan. The Committee cross-examined seven of those witnesses. The Secured Lenders called two witnesses in support of the Plan. The Committee cross-examined both of these witnesses. The Committee called three expert witnesses to oppose the confirmation of the Plan. Hawaiian Telcom and the Secured Lenders cross examined each of the Committee's witnesses.

At the end of closing arguments on November 13, 2009, the parties submitted the matter to the Court and the Court stated that the Plan will be

2

confirmed and requested findings of fact and conclusions of law from the Debtors.

Post-trial negotiations among the participants at the confirmation hearing resulted

in proposed findings and a proposed confirmation order acceptable to all parties,

including the committee. The proposed documents were received by the court on

December 28, 2009. Because these documents are consensual, only minimal

changes have been made by the court.


## FINDINGS OF FACT

### I.  HAWAIIAN TELCOM BACKGROUND

####   A.  History And Background.

1.  Hawaiian Telcom has been operating for more than 125 years and is the

    incumbent local exchange carrier ("ILEC") for the State of Hawaii.[3]

2.  Hawaiian Telcom is the largest telecommunications provider in Hawaii and

    offers a wide range of communications services throughout the State of

---

[3]  Yeaman Direct ¶ 3; Reich Direct ¶ 10.

Docket No. 1343, Written Direct Testimony of Eric K. Yeaman ("Yeaman Direct"). Mr. Yeaman is the President and Chief Executive Officer of Hawaiian Telcom. Mr. Yeaman is responsible for all aspects of Hawaiian Telcom's business and operations, including Hawaiian Telcom's restructuring activities.

Docket No. 1356, Written Direct Testimony of Robert F. Reich ("Reich Direct"). Mr. Reich is the Senior Vice President, Chief Financial Officer and Treasurer of Hawaiian Telcom. He has held that position on an interim and then permanent basis since March of 2008. As Chief Financial Officer, Mr. Reich oversees all financial operations, including treasury, financial analysis and reporting, corporate and regulatory accounting, tax issues, risk management and investor relations.

3

Hawaii, including local exchange, long distance, network access, data and internet services, as well as wireless.[4]

3. Hawaiian Telcom is regulated by both the Hawaii Public Utilities Commission (the "HPUC") and the Federal Communications Commission (the "FCC").[5]

**B. Events Leading To The Chapter 11 Cases.**

4. In May 2005, The Carlyle Group acquired Hawaiian Telcom from Verizon Communications ("Verizon") in a $1.6 billion leveraged buy-out.[6] The Secured Lenders financed that transaction and, in exchange, obtained liens on substantially all of Hawaiian Telcom's assets, as further discussed below.[7]

5. After the acquisition, Hawaiian Telcom faced significant short and long-term challenges, including keeping pace with quickly-evolving telecommunications technologies and overcoming difficulties with the

---

[4] Yeaman Direct ¶ 3; Reich Direct ¶ 10.

[5] Reich Direct ¶ 11.

[6] Reich Direct ¶ 12.

[7] See Debtors' Exhs. 5-9, consisting of the relevant 2005 credit and security agreements and the 2007 credit and security agreements, which amended the 2005 credit and security agreements.

4

transition of certain back-office functions from Verizon.[8]

6.     Hawaiian Telcom also realized it would have difficulty satisfying its capital expenditure needs while meeting its debt servicing requirements.[9] Indeed, as of December 1, 2008 (the "Petition Date"), Hawaiian Telcom's liabilities included: (a) $589.5 million (plus accrued interest) in connection with the senior secured credit facility and certain secured swap agreements; (b) $350 million (plus accrued interest) on account of the Senior Notes; (c) $150 million (plus accrued interest) on account of 12.5% subordinated notes; and (d) approximately $45 million of trade obligations and other general unsecured claims.[10]

7.     The overleveraged capital structure made it difficult for Hawaiian Telcom to compete effectively with Oceanic Time Warner, its primary competitor.[11]

**C.    Hawaiian Telcom's Restructuring Efforts.**

8.     In 2008, Hawaiian Telcom hired a new management team in an effort to explore all strategic opportunities and to improve operating results.[12] As

---

[8]     Reich Direct ¶ 12.

[9]     Reich Direct ¶ 12.

[10]     Ex. D-2 at 42 (Disclosure Statement).

[11]     Reich Direct ¶ 72.

[12]     Reich Direct ¶ 14.

5

part of the management efforts to explore all available opportunities, Hawaiian Telcom retained Zolfo Cooper LLC ("Zolfo Cooper") and Lazard as advisors.[13]

## 1. Hawaiian Telcom's Strategic Business Plan and Next Generation Television.

9.  The new management team developed a revised strategic business plan that will allow Hawaiian Telcom to compete and succeed in the rapidly changing and competitive telecommunications industry.[14] The business plan focuses on introducing new products, simplifying existing product offerings, improving customer service, leveraging network infrastructure, improving processes and systems and rebuilding customer confidence.[15]

10. One key component of Hawaiian Telcom's business plan is to become a leading provider of Next Generation Television ("NGTV").[16] NGTV is a critical product for Hawaiian Telcom to be able to effectively compete with Oceanic Time Warner in offering bundled services.[17]

---

[13]     Reich Direct ¶¶ 15, 17.

[14]     Reich Direct ¶ 69.

[15]     Reich Direct ¶ 69; see also November 9, 2009 Confirmation Trial Transcript ("Tr.") at 73:19-20 (Reich testimony) (stating that the business plan involves "expanding the capabilities of the network").

[16]     Reich Direct ¶ 72.

[17]     Reich Direct ¶ 72; Edl Direct ¶ 11.

(Continued…)

6

11. Hawaiian Telcom's financial projections show positive growth in NGTV in 2011.[18] Without a successful launch of NGTV, Hawaiian Telcom is less likely to reach positive net income in 2011 as projected.

12. Hawaiian Telcom's main competitor, Oceanic Time Warner, currently offers a bundled "triple play" product where customers receive telephone services, broadband internet and digital television through one company.[19]

13. While NGTV is an important part of the business plan, Hawaiian Telcom's launch of NGTV faces many technical and logistical hurdles, including (a) the need to obtain certain regulatory approvals for NGTV and to ensure that NGTV's launch will be able to comply, economically, with all regulatory requirements; (b) the need to design, implement, deploy, integrate and/or test of significant network equipment and IT systems related to the provision of NGTV; (c) the need to design, develop and/or enhance the Company's provisioning, billing, accounting, business intelligence and reporting systems to incorporate and support NGTV and bundled products, as well as

---

Docket No. 1345, Written Direct Testimony of Michael F. Edl ("Edl Direct"). Mr. Edl is the Senior Vice President for Network Services at Hawaiian Telcom. He leads the group that operates Hawaiian Telcom's network, and the Network Services group is responsible for Engineering, Planning and Construction, Network Reliability, Field Operations, Operations Support and Provisioning. Mr. Edl joined the company in August 2008. Edl Direct ¶ 11.

[18] Reich Direct ¶ 59.

[19] Edl Direct ¶ 10.

7

marketing and sales promotions, packages and special offers; (d) the need to train sales, customer support, technical support, field support and network support staff; and (e) the need to complete a trial deployment of approximately 200 premise installations.[20]   Hawaiian Telcom's NGTV product offering will also face serious competitive challenges from Oceanic Time Warner, one of the most entrenched incumbent cable providers in the entire United States.[21]

14. The Committee did not challenge Hawaiian Telcom's business plan or future growth strategy during the trial.  It did not contend that Hawaiian Telcom's

---

[20]   Edl Direct ¶ 12; Reich Direct ¶ 79; Melton Direct ¶ 75; Wilson Direct ¶ 26-27.

Docket No. 1358 Written Direct Testimony of J. Nicholas Melton, Lazard Frères & Co., LLC, ("Melton Direct").  Mr. Melton is a Managing Director of Lazard.  Mr. Melton has provided professional services in a variety of telecommunications industry transactions, including mergers and acquisitions, restructurings and public and private financings and has more than 15 years of relevant work experience.  Melton Direct ¶¶ 6, 7.  Mr. Melton provided an expert opinion regarding the Debtors' enterprise value.

Docket No. 1361 Declaration of Christopher Wilson in Support of Secured Lenders' Memorandum of Law in Support of Joint Chapter 11 Plan of Reorganization of Hawaiian Telcom Communications, Inc. and Affiliated Debtors ("Wilson Direct").  Mr. Wilson is a Managing Director and head of the Media & Telecommunications Group at of Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan"), an international investment bank retained by Weil, Gotshal & Manges LLP ("WGM"), counsel to the Secured Lenders.  Wilson Direct ¶ 1.  Mr. Wilson was admitted as the Secured Lenders' valuation expert on the Debtors' total enterprise value and the value of the proposed warrants under the Plan.  Mr. Wilson's expertise includes the valuation of business entities and their debt and equity instruments, and has advised various constituencies in numerous reorganizations and distressed situations. Wilson Direct ¶ 3.

[21]   Edl Direct ¶ 12; Reich Direct ¶ 80; Melton Direct ¶ 75; Wilson Direct ¶ 25.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 13 of 99

business plan is unreasonable, was not properly developed or did not account for the potential growth or certain challenges associated with new technologies.[22]

### 2.    Out-Of-Court Efforts To Delever The Capital Structure.

15.    Under the direction of the new management team, and with Lazard's assistance, Hawaiian Telcom also undertook substantial out-of-court efforts in 2008 to effectuate a balance sheet restructuring.[23]    Hawaiian Telcom contacted the Senior Noteholders, the Secured Lenders and The Carlyle Group, among others.

16.    In October 2008, Hawaiian Telcom's management and advisors approached the Senior Noteholders with a proposal that would have provided the Senior Noteholders an opportunity to invest in the company at an implied value of approximately $500 million.    The Senior Noteholders declined.[24]    At the same time, Lazard began soliciting third party interest in a potential

---

[22]    November 13, 2009 Tr. at 208:1-7 (Committee Counsel argument) (stating that the Committee is not challenging "the feasibility of the [P]lan").

[23]    Yeaman Direct ¶ 4; Reich Direct ¶ 21.

[24]    Reich Direct ¶ 19; November 9, 2009 Tr. at 52:10-53:6 (Yeaman testimony); Melton Direct ¶ 76.

9

financing and/or strategic investment transaction.[25]

17.    Ultimately, the Debtors were unable to consummate an out-of-court restructuring.[26]

### D.    The Chapter 11 Cases.

18.    On the Petition Date, December 1, 2008, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[27]

#### 1.    The Cash Collateral Order.

19.    Hawaiian Telcom has financed the chapter 11 cases using cash on hand, which constitutes the cash collateral of the Secured Parties under section 363 of the Bankruptcy Code. After resolving the Committee's objections to the use of cash collateral and related adequate protection consensually, the Debtors, the Secured Parties and the Committee agreed upon the terms of the final cash collateral order, dated January 16, 2009, as amended and

---

[25]    Ex. D-2 at 48 (Disclosure Statement) ("Prior to the commencement of the chapter 11 cases, Lazard contacted approximately 12 institutions including four strategic investors and eight financial investors.").

[26]    Reich Direct ¶ 21.

[27]    Reich Direct ¶ 21.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 15 of 99

supplemented.[28]

20.    Pursuant to the Cash Collateral Order as modified by the first order extending the Cash Collateral Order entered on February 27, 2009, [Docket No. 478], Hawaiian Telcom has made and must continue to make, *inter alia*, adequate protection payments to the Secured Parties in cash in an amount equal to postpetition interest at the non-default rate on $300 million of prepetition secured claims.[29]    Adequate protection payments equal to interest on the Secured Parties' claims in excess of $300 million, to the extent allowed, have been paid in kind and added to the Secured Parties' prepetition claims, without prejudice to the Secured Parties' claim for interest at the default rate.[30]    Pursuant to the Cash Collateral Order, Hawaiian Telcom has also made and must continue to make adequate protection payments in an amount equal to all fees and expenses due under the Prepetition Financing Documents (as defined in the Cash Collateral Order), including the fees and expenses of the Secured Parties' legal counsel

---

[28]    Docket No. 291, Final Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of Bankruptcy Code, and (II) Providing Adequate Protection to Prepetition Secured Lenders Pursuant to Sections 361, 362 and 363 of Bankruptcy Code, dated January 16, 2009, together with each of the subsequent extensions and amendments thereto (the "Cash Collateral Order").

[29]    Cash Collateral Order, ¶ 9(c).

[30]    Cash Collateral Order ¶ 9(c).

11

U.S. Bankruptcy Court - Hawaii  #08-02005  Dkt # 1569  Filed 12/30/09  Page 16 of 99

and other professionals.[31]

21.     Moreover, "[d]uring the period the Debtors use cash collateral ... no administrative claims ... shall be charged or assessed against or recovered from the Collateral or attributed to the Prepetition Secured Parties with respect to their interests in the Collateral pursuant to the provisions of section 506(c)."[32]

22.     Section 9 of the Cash Collateral Order is clear that the Secured Parties were entitled to adequate protection for any and all diminution in the value of the Collateral, and provides, in relevant part:

> The [Secured Parties] are entitled, under section 363(e) of the Bankruptcy Code, to adequate protection with respect to their interest in the [collateral], for and equal in amount to the aggregate diminution in value of the [Secured Parties'] interests in the [collateral], including any such diminution resulting from (a) the use of Cash Collateral, (b) the sale, lease, or use by the Debtors (or other decline in value) of the [collateral], and (c) the imposition of the automatic stay under section 362 of the Bankruptcy Code.[33]

23.     Pursuant to the terms of the Cash Collateral Order, "[a]dequate Protection Payments shall be subject to any parties' rights to seek recharacterization ...

---

[31]     Cash Collateral Order, ¶ 9(c).

[32]     Cash Collateral Order ¶ 5(b).

[33]     Cash Collateral Order ¶ 9

12

of such payments as payments in satisfaction of principal amounts due under the Prepetition Financing Documents." [34]

### 2. Operations During Chapter 11.

24. Throughout the chapter 11 cases, Hawaiian Telcom has continued to operate and improve its network, through capital expenditures ("capex") aimed at enhancing existing products, developing new products, improving back-office and IT systems, and necessary maintenance and repair of the network.[35]

### 3. Development Of The Plan.

25. After the Petition Date, Lazard continued to market Hawaiian Telcom to potential purchasers. From September 2008 through the confirmation proceeding, Lazard contacted approximately 38 institutions, including 13 strategic investors and 25 financial investors. Several potential investors, including strategic purchasers, submitted formal indications of interest to acquire Hawaiian Telcom for approximately $300 to $400 million. No deal was completed.[36]

---

[34]    Cash Collateral Order ¶ 9(c)

[35]    Reich Direct ¶¶ 72-73.

[36]    Melton Direct ¶ 76.

13

26.  Prior to engaging the Secured Lenders in Plan negotiations, Hawaiian Telcom conducted an independent review of the Secured Parties' liens. Hawaiian Telcom concluded that the Secured Parties have liens on and security interests in substantially all of the assets of the Debtors' businesses, including substantially all of the Debtors' cash and all equipment, fixtures, accounts receivable, all intangibles (including brand names, intellectual property, customer lists and relationships, and goodwill) and major buildings.[37]

27.  The outcome of the Debtors' lien analysis is consistent with the Court's August 20, 2009 ruling that the Secured Parties have perfected liens in the Debtors' "personal property" that "is described in Section 4.01 of the

---

[37]  Reich Direct ¶ 22; Nystrom Direct ¶¶ 22-23; November 13, 2009 Tr. at 16:7-12 (Schaeffer Testimony) (recognizing certain aspects of the Secured Parties' collateral package through estimate of value of the encumbered tangible assets); id. at 19:11-17 (recognizing certain aspects of the Secured Parties' collateral package related to encumbered intangible assets).

Docket No. 1357, Written Direct Testimony of Kevin Nystrom ("Nystrom Direct"), ¶¶ 1, 22-23. Mr. Nystrom is the Chief Operating Officer of Hawaiian Telcom and is also a Managing Director at Zolfo Cooper. Mr. Nystrom first worked on the Hawaiian Telcom engagement when Hawaiian Telcom engaged Zolfo Cooper to assist the company with its restructuring in February 2008. Nystrom Direct ¶ 2. Mr. Nystrom testified on both November 9, 2009 and November 12, 2009.

Mr. Schaeffer was admitted as the Committee's valuation expert, specifically, on the Debtors' total enterprise value and on the proposed warrants under the Plan. Docket No. 634 Declaration of Luke Schaeffer in Support of the Objection of the Official Committee of Unsecured Creditors of Hawaiian Telcom Communications, Inc., to Confirmation of the Joint Chapter 11 Plan of Reorganization of Hawaiian Telcom Communications, Inc. and Its Debtor Affiliates ("Schaeffer Direct") ¶ 7.

U.S. Bankruptcy Court - Hawaii  #08-02005  Dkt # 1569  Filed 12/30/09  Page 19 of 99

Amended and Restated Collateral and Guarantee Agreement," dated as of June 1, 2007 and as supplemented by Supplement No. 1, dated as of October 24, 2008, except for the Debtors' motor vehicles; the Debtors' "Encumbered Real Property described in The Amended and Restated Mortgage," dated as of June 29, 2007; the Debtors' "fixtures located on the Encumbered Real Property"; and the Debtors' "fixtures that are not attached to the Encumbered Real Property."[38] The Court found that there was a genuine issue of material fact as to the perfection of the Secured Parties' lien on the funds in Hawaiian Telcom's deposit accounts at First Hawaiian Bank and the Bank of Hawaii.[39] The Court assumed for the purpose of the confirmation hearing that the Secured Parties' liens on such funds are valid and perfected.[40]

28. Based on its analysis of the Secured Parties' liens and security interests and their senior position in the capital structure, Hawaiian Telcom identified the

---

[38] Adversary Proceeding, Case No. 09-90023, Docket No. 69, at 2-3 (August 20, 2009 Order Granting In Part and Denying In Part Plaintiff's Motion for Summary Judgment).

[39] Id.

[40] November 13, 2009 Tr. at 173:6-14 (statements by the Court) ("[U]nless something is declared invalid . . . we assume for the purposes of this hearing, and I have been assuming, that you have a security interest.").

15

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 20 of 99

Secured Parties as the key economic stakeholders in Reorganized Hawaiian Telcom with which to negotiate a plan of reorganization.[41]

29.    In March 2009, Hawaiian Telcom and the Secured Lenders, with their respective advisors, began the negotiations that led to the Plan. The Plan is the product of good faith arm's length negotiations between, among other entities, Hawaiian Telcom and the Secured Lenders.[42]

30.    The negotiations were time consuming, but resulted in a Plan that accomplishes the goals Hawaiian Telcom detailed at the outset of these cases. The Plan maximizes value for all creditors, significantly deleverages the capital structure, will enable Hawaiian Telcom to implement its business plan and is worthy of the required regulatory approvals from the FCC and the HPUC.[43]

31.    Hawaiian Telcom developed the Plan with the goal of maximizing value for all creditors. As a result of Hawaiian Telcom's efforts, the Secured Parties agreed to waive their deficiency claim.[44] In addition, the Secured Parties waived their right to any recovery from the successful pursuit of avoiding

---

[41]    Nystrom Direct ¶ 24; Reich Direct ¶¶ 54-55.

[42]    Nystrom Direct ¶ 24; Reich Direct ¶¶ 54-55.

[43]    Nystrom Direct ¶ 24; Reich Direct ¶¶ 54-55.

[44]    Reich Direct ¶ 24.

U.S. Bankruptcy Court - Hawaii  #08-02005  Dkt # 1569  Filed 12/30/09  Page 21 of 99

power and other claims of Hawaiian Telcom's estates arising under chapter 5 of the Bankruptcy Code. Doing so allowed Hawaiian Telcom to provide a greater recovery to the unsecured creditors under the Plan.[45]

32. Throughout these chapter 11 cases Hawaiian Telcom provided for an open and transparent process. While negotiating with the Secured Lenders, Hawaiian Telcom's management team and advisors maintained open dialogues with other key constituents, including the Committee, the HPUC and the International Brotherhood of Electrical Workers, Local 1357 ("IBEW").[46]

33. Hawaiian Telcom's negotiation of the Plan was in good faith and resulted in a Plan that is fair and equitable to all creditors.[47]

## II. THE PRIMARY CONTESTED ISSUES AT CONFIRMATION.

34. The Debtors' Plan is based upon the range of enterprise values determined by Lazard.[48] Recoveries under the Plan are based upon the Debtors'

---

[45] Mandava Direct ¶ 13.

Docket No. 1347, Written Direct Testimony of Suneel Mandava, Lazard Frères & Co., LLC ("Mandava Direct"). Mr. Mandava is a Director at Lazard and a FINRA Series 7 licensed General Securities Registered Representative, has passed the Certified Public Accountant's exam, and has served in a variety of analyst and consultant position and has over 14 years of relevant work experience. Mandava Direct ¶ 8. Mr. Mandava provided expert opinion regarding the use and value of warrants under the Plan as well as the recoveries under the Plan.

[46] Nystrom Direct ¶ 24.

[47] Yeaman Direct ¶ 7; Reich Direct ¶ 16; Nystrom Direct ¶¶ 45-46.

17

prepetition capital structure as supplemented by the Debtors' negotiations with the Secured Lenders.

35.     The Committee objected to the Debtors' Plan on four primary grounds: (a) the Debtors' total enterprise value of Hawaiian Telcom, (b) the value of the Debtors' unencumbered assets, (c) the value and utility of warrants provided to the Senior Noteholders, and (d) the allocation of value between the Secured Parties and the unsecured creditors. Each area is addressed herein. Additionally, the Committee argued in its objection to confirmation that the Debtors did not propose the Plan in good faith, which is addressed in section I, supra, and section II.E, infra.

**A.     The Debtors' Enterprise Value.**

36.     Each of the Debtors, the Secured Lenders, and the Committee retained an expert witness to determine the total enterprise value ("TEV") of Hawaiian Telcom's businesses. Specifically, Lazard determined Hawaiian Telcom's TEV on behalf of the Debtors, Houlihan on behalf of the Secured Lenders, and Mr. Schaeffer of FTI on behalf of the Committee.

37.     While all three parties' experts used the same valuation methodologies, the Committee's expert's valuation was higher than both (a) the valuations

---

48      Ex. D-2 at 60-61 (Disclosure Statement).

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed   12/30/09   Page 23 of 99

reached by both the Debtors' and the Secured Lenders' experts, and (b) several market-based indicators of value. For the reasons set forth in this section, the Court accepts Lazard's total enterprise valuation.

### 1. The Debtors' Range of Enterprise Value Is Reasonable.

#### (a) The Debtors' Range Of Enterprise Value Is Between $350 And $425 Million.

38. The Debtors' TEV is $387.5 million. The Debtors' Total Distributable Value ("TDV") is $460 million.[49] TDV is calculated by adding to TEV $52 million of cash on hand after administrative expenses and $20 million of non-core assets.[50] All three valuation experts employed the three commonly accepted valuation methodologies, namely (a) the comparable company analysis, (b) the precedent transaction analysis, and (c) the discounted cash flow ("DCF") analysis.[51]

39. The lower end of the Lazard TEV range reflects the "market's likely . . . skepticism toward future prospects of the company . . . that's the $350 million range." The high end of the range, the $425 million range, reflects

---

[49]  Melton Direct ¶ 3.

[50]  Melton Direct ¶ 3.

[51]  Melton Direct ¶ 3; Schaeffer Direct ¶ 26; Wilson Direct ¶ 32.

19

"an appreciation . . . for management's execution of [its] turnaround strategy."[52]

**(b)** **The Lazard Enterprise Value Range Is Consistent With Houlihan's Analysis.**

40.  Lazard's TEV opinion is supported by the Secured Lenders' valuation expert, Houlihan, which determined that Hawaiian Telcom's TEV was $400 million and TDV was $420 million.[53]

**(c)** **The Enterprise Value Range Is Consistent With The Market's View of Hawaiian Telcom.**

41.  Lazard marketed Hawaiian Telcom to 38 potential investors during Hawaiian Telcom's restructuring efforts. From those efforts, "nobody submitted an indication of interest in excess of Lazard's enterprise valuation. Rather, potential investors, including strategic purchasers, submitted formal indications of interest to acquire Hawaiian Telcom for approximately $300 to $400 million."[54] Houlihan also considered this range of indications of

---

52   November 10, 2009 Tr. at 24:19-25:2 (Melton testimony).

53   Wilson Direct ¶ 8.

54   Melton Direct ¶ 76 ("Indeed, none of these indications of interest have demonstrated that Hawaiian Telcom has a value greater than the value found by Lazard"). See also November 13, 2009 Tr. at 11:20-14:19 (Schaeffer testimony) (testifying that he recalled indications of interest higher than $400 million, but could not recall the precise amounts).

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 25 of 99

interest to be indicative of the true market value of Hawaiian Telcom's TEV.[55]

42. Lazard's marketing effort provides "an interesting data point" in determining whether the ultimate valuation makes "sense."[56]

43. It is appropriate to examine market indications of interest in the context of current market environments to the extent they are available in determining the reasonableness of a valuation.

44. The market valuation of Hawaiian Telcom based on the trading prices of its debt, at $385.9 million, is also less than Lazard's enterprise valuation.[57] This fact further corroborates the multitude of evidence demonstrating that Hawaiian Telcom's TEV does not exceed the Plan's assumed TEV.

### 2. All Valuation Experts Utilized Common Enterprise Valuation Methodologies.

45. The comparable company analysis values Hawaiian Telcom based on the valuation of comparable publicly traded companies.[58] This analysis estimates how "the stock market would value this company."[59]

---

[55]  Wilson Direct ¶ 66.

[56]  November 10, 2009 Tr. at 84:20-85:3 (Melton testimony).

[57]  Wilson Direct ¶ 67.

[58]  Melton Direct ¶ 19; Wilson Direct ¶ 32.

[59]  November 10, 2009 Tr. at 20:16-20 (Melton testimony).

21

46. The precedent transaction analysis is based on what other companies have been willing to pay for similar companies in a market transaction.[60] This analysis estimates the value of Hawaiian Telcom in a mergers and acquisitions context.[61]

47. The DCF analysis is based on Hawaiian Telcom's financial projections and the net present value of the projected future cash flows.[62] "The discounted cash flow analysis is reflective of the management's plan."[63] The DCF methodology uses Hawaiian Telcom's management's projections and discounts the cash flows to present value.

### 3. Lazard Exercised Appropriate Judgment In Evaluating The Debtors' Enterprise Value.

#### (a) Lazard Properly Accounted For Hawaiian Telcom's Performance Relative To Peer Companies.

48. Hawaiian Telcom's financial and operational performance are important factors to analyze to determine enterprise value.[64] When the financial and

---

60     Melton Direct ¶ 44.

61     November 10, 2009 Tr. at 22:15-23:2 (Melton testimony).

62     Melton Direct ¶ 58.

63     November 10, 2009 Tr. at 23:17-24:5 (Melton testimony).

64     Melton Direct ¶¶ 13, 20, 55.

22

operational metrics are properly considered, Hawaiian Telcom should be valued on the low end of its peer group.[65]

49. Hawaiian Telcom's management's financial projections are lower than the financial projections for peer companies in the following categories: (a) 2009 expected EBITDA Margin; (b) 2009 expected free cash flow margin; (c) 2009 expected EBITDA growth; and (d) monthly EBITDA per access line.[66]

50. Hawaiian Telcom also performs below its peers in certain operating metrics. Hawaiian Telcom is below many of its peer companies in the following categories: (a) access lines per square mile – Hawaiian Telcom has more than many peer companies, indicating the density of the population served; (b) receipt of Universal Service Fund ("USF") subsidies – Hawaiian Telcom receives none; (c) cable overlap – Hawaiian Telcom, unlike most peer companies, has competition from cable for phone service in 100% of its service area; and (d) digital subscriber line ("DSL") penetration – only 20% of Hawaiian Telcom's access lines subscribe to its DSL service. Hawaiian Telcom's low rate of DSL penetration is of concern because in deploying

---

65     Melton Direct ¶ 24 ("[T]his range of multiples for Hawaiian Telcom is appropriate given its positioning relative to the comparable companies"); Wilson Direct ¶ 40-41.

66     Melton Direct ¶ 37; Wilson Direct ¶ 40.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 28 of 99

NGTV, Hawaiian Telcom will need to leverage its DSL base to "push that product through."[67]

51.     Based on Hawaiian Telcom's financial and operating performance compared to its peers, it is appropriate to value Hawaiian Telcom at the low end of the range indicated by comparable company and precedent transaction multiples. "[T]he bottom of the range reflects, frankly, the under-performance of the company relative to its peers, particularly on a free-cash-flow generation basis, as well as a number of other metrics that we examined."[68]

### (b)     Lazard's Valuation Is Supported By Hawaiian Telcom's Free Cash Flow Performance Metric.

52.     Free cash flow is a particularly relevant financial metric for Hawaiian Telcom and Hawaiian Telcom's free cash flow generation is lower than many of its peers.[69]

---

67     November 10, 2009 Tr. at 50:7-13 (Melton testimony); Melton Direct ¶ 41.

68     November 10, 2009 Tr. at 21:8-15 (Melton testimony). The Secured Lenders' expert witness took an even less optimistic view of Hawaiian Telcom's performance, noting that Hawaiian Telcom finished in the bottom half of nine different categories. Wilson Direct ¶ 40.

69     Melton Direct ¶ 26; see also November 10, 2009 Tr. at 34:6-12 (Melton testimony) ("[T]he basic equation for determining the value of a company is what is the cash-flow-generation ability of that company? What is the risk associated with those cash flows? And that's the fundamental building block of value."); November 10, 2009 Tr. at 33:25-34:2 (Melton testimony) ("[A] company that generates less money is worth less than the company that generates more money"); November 10, 2009 Tr. at 33:15-17 (Melton (Continued...)

24

53.    All three valuation experts measured free cash flow as EBITDA minus capex.[70] "EBITDA is revenue minus your cash operating expenses for the company. And then you take out your capital expenditures. That's the amount of cash the company is producing."[71]

54.    Hawaiian Telcom has relatively low EBITDA margins and relatively high capex, resulting in lower free cash flow margins than many comparable companies.[72] Hawaiian Telcom's EBITDA margins are lower than those of comparable companies for several reasons, including: (a) Hawaiian Telcom does not receive federal subsidies; (b) Hawaiian Telcom's revenue per access line is below that of its peers, reflecting Hawaiian Telcom's challenging competitive market; and (c) Hawaiian Telcom has relatively high labor costs.[73]

55.    Hawaiian Telcom's capital expenditures are relatively higher than those of its peers because, among other things: (a) the salt water environment

---

testimony); Wilson Direct ¶ 13; November 12, 2009 Tr. at 33:4-13 (stating that free cash flow is the "most important" measure of a company's profitability).

[70]    November 10, 2009 Tr. at 35:5-17 (Melton testimony); Wilson Direct ¶ 13; Schaeffer Direct ¶ 44. "Q. And do you agree with me that those, that free cash flow is an important metric to consider in valuing a company. A. It's, it's an important metric." November 13, 2009 Tr. at 40:19-22 (Schaeffer testimony).

[71]    November 10, 2009 Tr. at 33:8-12 (Melton testimony).

[72]    Melton Direct ¶¶ 27-29; Wilson Direct ¶ 13-14.

[73]    Melton Direct ¶ 28 ; November 10, 2009 Tr. at 37:2-25 (Melton testimony).

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 30 of 99

corrodes its plant, property and equipment; (b) Hawaiian Telcom has more central offices per access line; (c) it is more difficult to maintain a network because Hawaii is comprised of multiple islands; and (d) Hawaiian Telcom's predecessor owners, GTE and Verizon, deployed less modern equipment in Hawaii.[74]

56.     Given that Hawaiian Telcom's cash flow generation ability is "much lower than its peers," the EBITDA multiple has to be informed by the free cash flow multiple.[75]

> **(c)     Lazard's DCF Analysis Accounted For Hawaiian Telcom's Management's Projections Without Ignoring Market Risks.**

57.     The upper end of Lazard's TEV range accounts for Hawaiian Telcom's management's business projections.[76] This "reflects the possibility that the market will begin to appreciate the company's execution of . . . its strategy."[77]

---

[74]     Melton Direct ¶ 29; November 10, 2009 Tr. at 35:25-37:1 (Melton testimony); Edl Direct ¶ 8; Wilson Direct ¶ 13.

[75]     November 10, 2009 Tr. at 58:23-59:1 (Melton testimony); see also November 10, 2009 Tr. at 33:18-22 (Melton testimony) ("If you are applying an EBITDA multiple without considering the cash generation of the business then . . . you will incorrectly apply that EBITDA multiple."); Wilson Direct ¶ 13.

[76]     November 10, 2009 Tr. at 69:20-70:17 (Melton testimony).

[77]     November 10, 2009 Tr. at 21:16-18 (Melton testimony).

26

58. Lazard's TEV range is not the same as its DCF range.[78] This is justified in part because Hawaiian Telcom faces both implementation and market challenges in implementing its business plan.[79] The ultimate TEV range captures "the possibility that the strategy is successful, despite all the risks."[80]

59. The Court finds that Mr. Melton's methodology, opinions and conclusions are persuasive and Mr. Melton was a credible expert. In addition to Mr. Melton's written direct testimony, Mr. Melton appeared in Court and was cross examined by counsel for the Committee. Many of Mr. Melton's assumptions and conclusions were corroborated by the testimony of the Secured Lenders' expert, Mr. Wilson. Mr. Melton's testimony on cross examination was credible.

**B.    The Debtors Properly Valued The Unencumbered Assets.**

60. Under the Plan, the unsecured creditors' recovery is a function of the value of the unencumbered assets. Hawaiian Telcom analyzed the value of the motor vehicle fleet, the unencumbered real property, and certain of Hawaiian Telcom's easements and determined that the value of those

---

[78]    November 10, 2009 Tr. at 25:4-9 (Melton testimony).

[79]    November 10, 2009 Tr. at 30:11-32:11 (Melton testimony).

[80]    November 10, 2009 Tr. 25:10-17 (Melton testimony).

27

unencumbered assets was $33.1 million.[81]  The Committee disagreed and argued for a higher value.  At the confirmation trial, the values of the unencumbered real property and easements were contested, with three parties submitting different values.

### 1.    The Debtors' Value For The Motor Vehicles Is Appropriate And Unchallenged.

61.    The value of Hawaiian Telcom's motor vehicle fleet was not contested.  The Debtors initially valued their motor vehicles at approximately $1.4 million, based on their book value.[82]

62.    The Debtors later reviewed this valuation and determined that, based on Kelly Blue Book value or other similar market indicators, the motor vehicles may have a value of $3.3 million.[83]

63.    Using either the book value or the Kelly Blue Book value for the motor vehicles provides a reasonable basis for determining their fair market value. The difference between their book and Kelly Blue Book values is not material under the Debtors' allocation of value and waterfall analysis.[84]

### 2.    The Debtors' Range Of Value For

---

81    Ex. D-2 at 62 (Disclosure Statement); Mandava Direct ¶ 15.

82    Ex. D-2 at 61 (Disclosure Statement).

83    Nystrom Direct ¶ 68; Mandava Direct ¶ 17.

84    Mandava Direct ¶ 17.

28

### Unencumbered Real Property Held In Fee Is Reasonable.

64.     The Debtors determined the value of the unencumbered real property held in fee to be $31.7 million.

#### (a)     The Debtors Reasonably Valued The Unencumbered Real Property At $31.7 Million.

65.     The Debtors' determination used the tax-assessed values of the unencumbered real properties as a proxy for their value. The tax assessed values were determined by matching the parcels of unencumbered property held in fee with their tax-assessed values from the county tax assessors' web sites.[85]

66.     The reasonableness from the perspective of unsecured creditors of the $31.7 million value the Plan ascribed to the unencumbered real property was confirmed by the independent $19.1 million valuation reached by the Secured Lenders' appraisal expert, James E. Hallstrom, Jr., who appraised the fair market value of the unencumbered properties using a sales comparison approach.[86] In fact, the difference between the tax assessed

---

[85]     Ex. D-14 at 3 (Zolfo Cooper Report); Mandava Direct ¶ 17.

[86]     Hallstrom Direct ¶¶ 8, 14.

Docket No. 1362, Declaration of James E. Hallstrom, Jr., in Support of Secured Lenders' Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Hawaiian Telcom Communications, Inc. and Its Debtor Affiliates ("Hallstrom Direct"). Mr. Hallstrom has 38 years of appraisal experience in Hawaii, is licensed in the State of Hawaii and holds the CRE, MAI and SPRA designations.
(Continued...)

29

value of the properties under the Plan and the actual fair market value of the properties under Mr. Hallstrom's valuation demonstrates that the unsecured creditors are receiving more under the Plan than they would be receiving under a traditional waterfall. The excess consideration the unsecured creditors are receiving results from an agreement by the Secured Parties to provide excess value to the unsecured creditors.

**(b) The Debtors' And Secured Lenders Experts' Testimony On Easements Establish That They Have No Market Value.**

67. The Debtors, Secured Lenders and the Committee's experts agreed that the proper method for valuing the Debtors' unencumbered easements was to determine their market value.[87] The three primary methods to determine market value are the sales comparison approach, the income approach, and the cost approach.[88]

68. The most common method for valuing easements is the sales comparison approach. The Debtors' appraisal expert, Robert C. Hastings, Jr., MAI,

---

Hallstrom Direct ¶ 3. Mr. Hallstrom was qualified to testify as the Secured Lenders' real estate appraisal expert and opined on the value of the Debtors' unencumbered fee and easement real property interests.

[87] Hastings Direct ¶ 13; Hallstrom Direct, ¶ 23; November 12, 2009 Tr. at 149:16-18 (Tesh testimony).

[88] Hastings Direct ¶ 10; November 12, 2009 Tr. at 85:10-13 (Hallstrom testimony).

30

SRPA, and the Secured Lenders' expert, Mr. Hallstrom, agreed that the Debtors' easements have no market value.[89]

69. Mr. Hastings and Mr. Hallstrom applied recognized market valuation methodologies in valuing the easements. Mr. Hastings used the recognized sales comparison approach to value the easements.[90] Similarly, Mr. Hallstrom considered whether a market exists for the easements.[91]

70. In his 40 years working in real estate valuation in Hawaii, having seen "20,000 to 40,000" easements, Mr. Hastings is unaware of a market for restricted-use easements.[92]

71. Further, because almost all easements are granted for nominal consideration, usually $1 or $10, the nominal price also suggests that landowners place virtually no value on the easements.[93]

72. Similarly, in his "38 years of appraising in the Islands [Mr. Hallstrom] ha[s] never come[] across a buyer or seller of an existing easement."[94]

---

[89] Hastings Direct ¶¶ 32-33; Hallstrom Direct ¶ 23.

[90] Hastings Direct ¶ 32.

[91] Hallstrom Direct ¶ 26.

[92] November 10, 2009 Tr. at 148:2 (Hastings testimony); Hastings Direct ¶ 35.

[93] Hastings Direct ¶ 41; see November 12, 2009 Tr. at 162:9-14 ("Q. If a landowner is willing to give . . . an easement for nominal value, that could suggest that the market value is low, isn't that right? A. Of the individual easement? Q. Right. A. It could suggest that.").

31

73. Mr. Hastings also conducted additional research specific to this case to determine if such a market existed.[95] He "[l]ooked in the Bureau of Conveyances . . . talked to [his] partners [and] associates" and looked at a real estate marketplace web site.[96]

74. "[U]nder the circumstances, after analyzing all of the data, there were no sales, there were no buyers, there was no market . . . [a]nd that is what led to a value of $0 for each of the easements."[97]

75. In addition, other utility companies, such as Oceanic Time Warner, use the Debtors' easements without securing their own easements.[98] Accordingly, Oceanic Time Warner would not be interested in buying the Debtors' easements because "they have the right to pull through the conduit or they

---

94    November 12, 2009 Tr. at 86:10-12 (Hallstrom testimony).

95    November 10, 2009 Tr. at 123:4-12 (Hastings testimony).

96    November 10, 2009 Tr. at 123:6-8 (Hastings testimony).

97    November 10, 2009 Tr. at 121:23-122:2 (Hastings testimony).

98    Hastings Direct ¶ 38; November 12, 2009 Tr. at 188:18-21 (Tesh testimony) (stating his awareness that Oceanic Time Warner used Hawaiian Telcom's easements), 189:15-18 ("Q. Now, you're aware that there are laws that require a power company to allow a telecommunications company to use their easements, aren't you? A. I am.") Nov. 12, 2009 (Tesh testimony); Hrg. Tr. 151:8-13, Nov. 9, 2009 (Edl Testimony) (testifying that other utility companies run their lines on Hawaiian Telcom's easements, for a fee)..

32

have the right to attach to poles throughout the entire system that Hawaiian Telcom operates, along with the power companies."[99]

76. Both Mr. Hastings and Mr. Hallstrom were cross-examined on their valuation conclusions. Both Mr. Hallstrom and Mr. Hastings relied on appropriate methodologies and their opinions and testimony are credible.[100]

77. Hawaiian Telcom's easements do not form a corridor. A corridor is a long, narrow strip of property rights for which the highest and best use is to provide an economic or social benefit by connecting the end points.[101] Hawaiian Telcom's easements do not form a corridor by themselves because "these easements connect up end to end with public rights-of-way."[102] They may form a corridor in combination with other parts of the Debtors' network, but the easements themselves do not have connectivity because "they don't always connect through Hawaiian Telcom property."[103]

---

99  November 10, 2009 Tr. at 125:16-19 (Hastings testimony); see also November 10, 2009 Tr. at 125:16-19 (Hastings testimony) ("[T]here is no evidence that any payment is made in the income approach[on account] of these very limited easement rights.").

100  November 13, 2009 Tr. at 226:17-21 (statement by the Court).

101  Tesh Direct ¶ 37.

102  November 10, 2009 Tr. at 107:10-11 (Hastings testimony); November 12, 2009 Tr. at 194:7-14 (Tesh testimony); see also November 10, 2009 Tr. at 107:14-16 (Hastings testimony) ("Basically, most of these are going to be the extension . . . from trunk lines within the public right-of-way to individual residences.").

103  November 12, 2009 Tr. at 192-21:194:6 (Tesh testimony).

33

78. In addition, a review of SEC filings or other possible disclosures from telecommunications companies demonstrates that easements are not valued independently of the network.[104]   The same is true for Wall Street analyst reports.[105]

79. There is no buyer for these easements apart from a potential  buyer of the Debtors' entire enterprise.  During Lazard's efforts to market the Debtors' business, Lazard did not receive any inquiries regarding a transaction involving just the easements.[106]

80. Also, Hawaiian Telcom does not separately account for its easements or carry them as an asset on its books.[107]   While the Debtors capitalize costs associated with acquiring easements, this does not reflect that the easements have an independent value.[108]   Those costs are necessary for placing a

---

[104]   Melton Direct ¶ 78.

[105]   Melton Direct ¶ 79.

[106]   Melton Direct ¶ 79.

[107]   Melton Direct ¶ 80; Reich Direct ¶ 85.

[108]   Reich Direct ¶ 83 (explaining that "because it is the poles, lines, and other equipment on the easements that generate revenue, these are the items that generate value"); November 9, 2009 Tr. at 150:4-5 (Edl testimony) ("[T]he value is in the transmission facilities that ride on those poles.").

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed  12/30/09   Page 39 of 99

portion of the Debtors' network in use, but they are not attributable to any value for the easements.[109]

81.     The asset that appears in the Debtors' 10-K for 2007 titled "franchise for street right of way" is not related to the value of easements or rights of way but "represents the capitalization of tax avoidance resulting from the Debtors' franchise street right of way."[110] "It relates to the avoidance that [Hawaiian Telcom's] franchise provides to avoid a ... 2-$\frac{1}{2}$% utility tax."[111]

82.     Moreover, when The Carlyle Group acquired the company in 2005, it did not attribute any value to the easements.[112]

### (c)     The Debtors Would Not Need To Move Off The Unencumbered Property.

83.     Even if there were any basis to assume the Debtors might need to replace the easements, the Debtors have the power of eminent domain and could reacquire any unencumbered property or easements if needed.[113]

---

[109]    Reich Direct ¶ 83; see November 12, 2009 Tr. at 100:24-101:1 (Hallstrom testimony) ("On a stand-alone basis, an easement, a Hawaiian Telcom easement or another easement, does not create any kind of value.").

[110]    Ex. D-10 at 61 (Hawaiian Telcom Communications, Inc. Form 10-K for 2007); Reich Direct ¶ 85; November 9, 2009 Tr. at 75:16-17 (Reich testimony) (stating that there is no link between the tax avoidance and street rights of way).

[111]    November 9, 2009 Tr. at 75:19-21 (Reich testimony).

[112]    Wilson Direct ¶ 95.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 40 of 99

84. Using eminent domain, the Debtors would not have to pay any more than the properties' "fair market value." That value is determined by what the open and competitive market would pay. As discussed above, because of the highly specialized nature of the unencumbered property, the market either does not exist (for the easements) or would only support the cost of the land without the specialized structures thereon.[114]

85. And because 95% of the Debtors' easements are jointly owned with local power utilities, Hawaiian Telcom could continue to use the poles and conduits without moving any equipment.[115] This means that if the Debtors lost their rights to the easements, the easements would exist through the power company. [116] They would not need to reacquire the easements but "would be able to reattach [to] the poles, and [the] lines are there."[117] Even if the Debtors lost their easements, they would still own or have rights to use the poles and conduits that support the lines.

---

113    Hawaii Rev. Stat. § 101-4; Edl Direct ¶ 14; November 9, 2009 Tr. at 153:15-23 (Edl testimony) (stating that if the Debtors were being forced to move a central office, "we would use eminent domain to stay where we're at").

114    November 10, 2009 Tr. at 121:19-25 (Hastings testimony).

115    Hastings Direct ¶ 31; Hallstrom Direct ¶ 24(a); November 12, 2009 Tr. at 158:17-20 (Tesh testimony).

116    47 U.S.C. § 224(f)(1); Haw. Admin. Rules § 6-80-74(a).

117    November 10, 2009 Tr. at 137:9-10 (Hastings testimony) (noting that the Debtors "already had their equipment in place").

36

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 41 of 99

86. Hawaiian Telcom would not have to pay more than fair market value, if anything, to reacquire any land interests in easements or the unencumbered property because of its statutory rights of eminent domain and rights regarding shared telecommunication poles and conduits

### 3. The Evidence Of The Value Of The Encumbered Assets Is Not Necessary To The Court's Analysis Of The Debtors' Plan.

87. In addition to the value of the unencumbered assets, the Committee also presented evidence regarding the value of the assets encumbered by the Secured Parties' liens. The Committee's evidence, while received by the Court, is not necessary to this Court's determination. Given the extent of the Secured Parties' liens as well as the proper enterprise valuation, there is no need to determine the exact value of the encumbered assets.

### C. Warrants Are An Appropriate Recovery Under The Plan.

88. The third primary contested area focused on whether warrants are an appropriate form of recovery for these chapter 11 cases and whether the Debtors properly valued the warrants. Hawaiian Telcom proved that warrants are an appropriate form of recovery and that the warrants have a value of $12.3 million. Additionally, Hawaiian Telcom established it is protecting substantial tax benefits by using warrants instead of common stock under the Plan.

37

### 1. Warrants Are An Appropriate Form Of Recovery For The Class 5 Claimants.

89. Under the Plan, the holders of Class 5 Claims, the senior noteholders, will receive in the money warrants with a value of $12.3 million.[118] The holders of these warrants can exercise these warrants without any out-of-pocket costs, through an optional cashless exercise feature.

#### (a) The Bankruptcy Code Requires Value, The Plan's Warrants Have Value.

90. A warrant is a security that gives the holder the right, but not the obligation, to acquire the underlying common stock of the company that issued the warrant at a specified price (the "exercise price") within a set period of time (the "term").[119]

91. The value of a warrant is comprised of (a) its intrinsic value and (b) the option premium. Intrinsic value is the amount by which a company's stock price exceeds the exercise price of the warrant. Warrants with intrinsic value are described as "in-the-money," while warrants without intrinsic value are described as "out-of-the-money." A warrant would be "at-the-money" or

---

[118]  Mandava Direct ¶ 3.

[119]  Mandava Direct ¶ 21.

38

out-of-the-money when the stock price is equal to or less than the exercise price, respectively.[120]

92. There is no evidence that the option premium should be ignored.[121] Indeed, the Secured Lenders' expert testified that because the common stock of reorganized Hawaiian Telcom will be publicly traded post-emergence, there will be a liquid market for the warrants in which holders of the warrants may realize the entire value of the warrants (intrinsic and option) by selling them to willing buyers at a minimal discount.[122]

93. The Committee's expert recognized that if the Committee's calculation of Hawaiian Telcom's TDV were correct, (a) the value of the Warrants would be substantially greater and (b) the subscription rights that were distributed to the Senior Noteholders under the Plan, which are currently valued at par under the Plan's assumed TDV, could also have significant value.[123]

### (b) Warrants Are Frequently Used in Chapter 11 Proceedings.

---

120    Mandava Direct ¶ 22.

121    November 12, 2009 Tr. at 242:22-243:6 (Schaeffer testimony).

122    Wilson Direct ¶ 71; November 12, 2009 Tr. at 246:3-248:19 (Schaeffer testimony).

123    November 12, 2009 Tr. at 256:17-260:22 (Schaeffer testimony).

39

94. Warrants are commonly used as consideration in bankruptcy proceedings and have been used to provide value to various stakeholders in several recent chapter 11 cases.[124]

95. Hawaiian Telcom provided evidence of both in- and out-of-the money warrants used in 11 different chapter 11 cases.[125] The Committee did not demonstrate that warrants are an inappropriate form of recovery in a contested plan and did not present evidence to contradict the Debtors' evidence on the use of warrants.[126]

96. The Committee's expert recognized that warrants are used in chapter 11 cases and testified that that he had "seen them in restructuring plans."[127]

### 2. The Debtors Preserve Substantial Tax Benefits From The Use Of Warrants Instead Of Common Stock.

97. By providing warrants instead of stock to the Senior Noteholders, Hawaiian Telcom will likely save in the range of $13 million to $31 million in federal income taxes between 2010 and 2013.[128]

---

[124]  Mandava Direct ¶ 16.

[125]  Mandava Direct ¶ 16-17.

[126]  November 13, 2009 Tr. at 227:12-17 (statements by the Court).

[127]  November 12, 2009 Tr. at 244:18-22 (Schaeffer testimony).

[128]  Tucker Direct ¶ 26.
Docket No. 1351, Written Direct Testimony of Howard Tucker, Ernst & Young LLP, Docket No. 1351 ("Tucker Direct"). Mr. Tucker is a Partner at Ernst & Young LLP
(Continued...)

40

### 3. The Debtors Properly Valued The Warrants.

#### (a) The Black-Scholes Model Is The Proper Method To Value The Warrants.

98. The warrants provide $12.3 million in value to the holders of Class 5 Claims when properly valued utilizing the Black-Scholes formula.[129] The Black-Scholes formula is a widely adopted tool to estimate the value of options, warrants, and other similar derivative instruments. Advisors to all three parties used the Black-Scholes formula to determine the value of the warrants under the Plan.[130] In addition, the evidence demonstrated that, because the Plan contemplates that the New Common Stock will be publicly traded post-emergence, there will be a liquid market where holders can freely sell their warrants to willing buyers with minimal discount.

#### (b) Lazard Utilized A Reasonable Time Period To Determine The Value Of The Warrants.

---

("E&Y") and has provided tax advisory services on behalf of E&Y to Hawaiian Telcom since November 2008. Mr. Tucker advised Hawaiian Telcom on various tax matters regarding Hawaiian Telcom's filing for bankruptcy and the impact of the Plan on Hawaiian Telcom's tax attributes, including net operating losses and net unrealized built-in losses. Tucker Direct ¶ 26. The Committee elected not to cross examine Mr. Tucker or contest any of his analysis.

129    Mandava Direct ¶ 32.

130    Mandava Direct ¶ 30; Wilson Direct ¶¶ 73-75; Schaeffer Direct ¶ 104.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 46 of 99

99.   The Black-Scholes model uses the following inputs to assess the value of warrants: (a) stock price; (b) exercise price; (c) volatility of the common stock; (d) term; and (e) risk-free rate.[131]

100.   Lazard used appropriate measures for each of the inputs, including an appropriate volatility measure. Lazard utilized a rolling 100-day average over a six month period to determine volatility based on a group of Hawaiian Telcom's peers.[132]

### D.   The Debtors Properly Allocated Value To The Constituents.

101.   The fourth primary contested issue is whether the Debtors properly allocated value between the Secured Parties and the unsecured creditors. The Debtors allocated value consistent with guidance from case law and the extent of the Secured Parties' liens. Based on the Debtors' allocation, the unsecured creditors will obtain a greater recovery under the Plan than under a traditional waterfall. Hawaiian Telcom also confirmed that the Plan was reasonable by checking the results of a traditional waterfall under an alternative allocation methodology. Under both approaches, the unsecured creditors will receive more under the Debtors' Plan.

---

131   Mandava Direct ¶ 31.

132   Mandava Direct ¶ 32; November 10, 2009 Tr. at 162:24-163:11 (Mandava testimony).

42

102. The Plan provides for a recovery of $12.3 million of value in warrants to holders of Class 5 Claims as well as up to $500,000 in cash to holders of other general unsecured claims.[133] Under a traditional waterfall, recoveries to unsecured creditors would be less than $10.6 million.[134] The Plan provides a recovery of $12.8 million for the unsecured creditors, which is greater than the amount the unsecured creditors would receive under a traditional waterfall plan.[135]

### 1. Under The Debtors' Allocation Of Value, The Senior Noteholders Receive A Greater Recovery Than Required By The Bankruptcy Code.

103. Hawaiian Telcom's analysis properly accounted for the scope of the Secured Parties' liens and the extent of recovery for the unsecured creditors.[136] Hawaiian Telcom allocated the going concern value of the encumbered assets, including intangibles, to the Secured Parties and allocated the going concern value of the unencumbered assets to the unsecured creditors.[137]

---

[133]  Mandava Direct ¶ 4.

[134]  Mandava Direct ¶ 3; see also, . ¶ 166 infra.

[135]  Mandava Direct ¶ 5.

[136]  Mandava Direct ¶ 13.

[137]  Mandava Direct ¶¶ 15-16.

43

104.    In order to allocate the value properly between the Secured Parties and the unsecured creditors, the Debtors first determined the scope of the liens held by the Secured Parties and determined that they had liens on substantially all of the Debtors' assets, except for certain categories of unencumbered assets.[138]

105.    Under the Debtors' allocation of value, Lazard first calculated the total distributable value before emergence and then deducted $33.1 million for unencumbered assets based on the Debtors' and their advisors' valuation of the unencumbered assets.[139]

106.    Mr. Mandava testified that under a traditional waterfall, after determining the distributable value and subtracting the value of the unencumbered assets, the Secured Lenders would have an unsecured deficiency claim of $154.5 million and the unsecured creditors would only recover $10.6 million.[140] Mr. Schaeffer conceded, however, that the recovery due to unsecured creditors under a waterfall analysis would be even less, because the Secured

---

138    Mandava Direct ¶ 13; Nystrom Direct ¶¶ 22-23; November 13, 2009 Tr. at 16:7-12 (Schaeffer testimony) (recognizing certain aspects of the Secured Lenders' collateral package through estimate of value of the encumbered tangible assets); id. at 19:11-17 (recognizing certain aspects of the Secured Lenders' collateral package related to encumbered intangible assets).

139    Mandava Direct ¶ 15.

140    Mandava Direct ¶¶ 15-16.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 49 of 99

Lenders are entitled, on account of their deficiency claim, to recover their pro rata share of the recovery of the Subordinated Noteholders pursuant to a subordination provision in the applicable indenture.[141]

### (a) The Declining Value Of The Collateral.

107. The adequate protection payments the Debtors paid to the Secured Parties were warranted because the evidence demonstrates that the collateral securing the Secured Parties' claims has suffered and will continue to suffer diminution in value since the Petition Date.[142] The Committee did not provide evidence to effectively dispute this fact; rather, the Committee's expert conceded that the value of certain of Hawaiian Telcom's equipment has deteriorated since the Petition Date and that Hawaiian Telcom's investments in its network have not been sufficient to outweigh this deterioration.[143]

108. Furthermore, the evidence shows that relevant measures of the enterprise value of Hawaiian Telcom demonstrate a decline in Hawaiian Telcom's

---

[141]  Schaeffer Direct ¶ 88 n. 18.

[142]  See infra. n. 251, 252.

[143]  Turner Direct ¶¶ 38-42, 45-46; November 12, 2009 Tr. at 130:22-131:16 (Turner testimony); id. at 137:15-18.

45

enterprise value since the Petition Date.[144]  Specifically, Mr. Wilson testified that projected declines in certain relevant measures of Hawaiian Telcom's financial and operational performance from the Petition Date through the projected emergence date include (a) a decrease in number of access lines since the Petition Date, (b) a decrease in cash balance, (c) a decrease in last twelve months revenue, (d) a decrease in last twelve months EBITDA; and (e) a decrease in free cash flow.[145]

### 2. Under The Alternative Methodology, The Senior Noteholders Receive A Greater Recovery Than Required By The Bankruptcy Code.

109.  Alternatively, Lazard conducted a separate analysis, whereby Hawaiian Telcom allocated the total distributable value (before emergence costs) between encumbered and unencumbered assets, based on the ratio of forced going concern sale values.[146]

110.  This analysis also used the $33.1 million midpoint of the unencumbered asset value range and Lazard's determination of enterprise value.  Lazard discounted the going concern value of all assets based on a forced sale (except for cash which would not have a discounted value) under the

---

144  Wilson Direct ¶¶ 9-15.

145  Wilson Direct ¶ 15.

146  Mandava Direct ¶ 18.

46

scenario that all assets were sold as a going concern.[147] Lazard applied the same forced going concern sale discount to the unencumbered assets, which would also be sold in a force sale scenario.[148]

111. Based on the alternative approach, the maximum value allocable to the unencumbered assets is $32.2 million, which provides a total recovery of only $10 million to the unsecured creditors. The Plan provides a total recovery to the unsecured creditors of $12.8 million.[149]

### 3. The General Unsecured Creditors' Recovery Is Appropriate.

112. Under the Plan, the holders of unsecured claims that are not Class 5 or Class 6 claims will receive a recovery of between 1% and 2% on their claims. They will receive those payments in the form of cash distributions.

113. The presence of the $500,000 cap ensures that the Debtors will have sufficient liquidity to fund distributions under the Plan and continue operations on the Effective Date.[150]

114. The unsecured creditors should be provided with cash pursuant to the Plan rather than warrants because these creditors would not receive any

---

147   Mandava Direct ¶ 18.

148   Mandava Direct ¶ 18.

149   Mandava Direct ¶ 19.

150   Reich Direct ¶ 45.

47

meaningful distribution through warrants based on the size of their claims (Classes 7, 8, 11, 12, 13, and 14 having no expected allowable claims; Class 9 having expected allowable claims of approximately $35 to $45 million; and Class 10 having expected allowable claims of approximately $5 million); and these trade creditors, who are situated differently than investors in the Debtors, would likely prefer a cash distribution instead of a distribution through warrants because warrants would require them to become investors in Reorganized Hawaiian Telcom.[151]

115.  Moreover, the Classes that will receive cash distributions voted in favor of the Plan.[152]

### E.  The Compensation Programs Were Developed And Proposed In Good Faith.

116.  In its Objection to the Plan, the Committee argued that the Debtors' management equity incentive program, which is part of the Plan (the "Management Equity Incentive Plan"), was proposed in bad faith.

---

[151]  Reich Direct ¶ 46.

[152]  McGuire Direct ¶¶ 3, 12.

Docket No. 1407 Supplemental Written Direct Testimony of Sean McGuire Kurtzman Carson Consultants LLC ("McGuire Direct"). Mr. McGuire is a Senior Managing Consultant for Kurtzman Carson Consultants LLC ("KCC"). Mr. McGuire managed KCC's efforts to serve the Solicitation Packages consistent with the Solicitation Order. Mr. McGuire further managed the tabulation of voting results for all classes other than the Class 5 Senior Noteholders. McGuire Direct ¶ 3.

48

However, there were no objections or challenges to the 2009 incentive compensation program (the "2009 Incentive Program") at the confirmation trial.

### 1. The Reserve of New Common Stock for the Management Equity Incentive Program Is Appropriate.

117. The Plan provides that 10% of the New Common Stock shall be reserved for a Management Equity Incentive Program (as defined in the Plan), which will be implemented by the board of directors of Reorganized Hawaiian Telcom.[153]

118. Reservation of 10% of the New Common Stock for the Management Equity Incentive Plan is reasonable.

### 2. The 2009 Incentive Program Is Appropriate.

119. The 2009 Incentive Program is a reasonable and necessary program for the Debtors. The 2009 Incentive Program covers all of Hawaiian Telcom's non-sales workers, including Hawaiian Telcom's union members and is necessary to incentivize Hawaiian Telcom's non-commissioned workforce.[154]

---

[153]  November 9, 2009 Tr. at 89:24-90:13 (Nystrom testimony).

[154]  November 9, 2009 Tr. at 91:4-8 (Nystrom testimony).

49

120. Under the 2009 Incentive Program, there are no guaranteed payments and the company must meet its target metrics before there is any payment. The financial performance relating to the 2009 Incentive Program has not yet been determined and any payments thereunder will not be made until 2010.[155]

121. The payments to senior management under the 2009 Incentive Program are necessary and appropriate. As part of the process to develop the 2009 Incentive Program, Towers Perrin reviewed the performance compensation provisions and analyzed the senior management's total compensation. Towers Perrin benchmarked the compensation against peers and with Towers' Perrin input, Hawaiian Telcom determined that senior management's compensation is at or below average. The 2009 Incentive Program is reasonable.[156]

122. Hawaiian Telcom presented the 2009 Incentive Program to the Court in the Spring of 2008 as part of its incentive compensation program and the 2009 Incentive Program was part of the Plan filed in the summer. While the Secured Lenders filed a "reservation of rights" before the confirmation trial, no party objected to the 2009 Incentive Program at the confirmation trial and

---

[155]   November 9, 2009 Tr. at 91:8-14 (Nystrom testimony).

[156]   November 9, 2009 Tr. at 91:15-92:2 (Nystrom testimony).

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 55 of 99

the Debtors' evidence on the 2009 Incentive Program stands unrebutted. The Secured Lenders submitted their case at the close of the confirmation trial without raising any argument or contradicting any evidence on this topic.

## III. THE PLAN COMPLIES WITH ALL NECESSARY STATUTORY PROVISIONS.

123. No party has contested the Plan's compliance with most of the provisions of section 1129 and the Debtors' evidence stands unrebutted and unchallenged. In those instances where the Committee challenged the statutory requirements, its evidence and arguments were unpersuasive.

124. The Committee's primary arguments may overlap with certain of the statutory requirements under section 1129 of the Bankruptcy Code detailed above. To the extent there is overlap, the evidence set forth <u>supra</u> is incorporated herein.[157]

125. Based upon these Findings of Fact and Conclusions of Law, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

### A. The Court Has Jurisdiction And The Debtors Are Eligible For Relief.

---

[157] The capitalized terms used herein have the same meaning provided in the Plan.

51

126. The Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§1408 and 1409. Confirmation is a core proceeding pursuant to 28 U.S.C. § 157(b) and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

127. The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

128. The Court takes judicial notice of the docket of the chapter 11 cases maintained by the Clerk of the Court, including, without limitation, all pleadings and other documents filed and orders entered thereon. The Court also takes judicial notice of all evidence proffered or adduced and all arguments made at the hearings held before the Court during the pendency of the chapter 11 cases.

**B.     The Debtors' Plan Complies With
         Section 1129(a)(1) of the Bankruptcy Code.**

129. The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including, without limitation, sections 1122 and 1123 of the Bankruptcy Code.

**1.     Proper Classification (11 U.S.C. §§ 1122 And 1123(a)(1)).**

130. The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code. Pursuant to sections 1122(a) and 1123(a)(1) of the

52

Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into 18 Classes, based on differences in the legal nature or priority of such Claims and Interests (other than Administrative Expense Claims and Priority Tax Claims, which are addressed in Article II of the Plan, and which are required not to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code).

131. The Plan's classification scheme follows the Debtors' capital structure.[158] Secured Claims are classified separately from General Unsecured Claims.[159] The Plan further divides the Debtors' prepetition unsecured debt into separate Classes.[160] Unsecured debt is classified separately for each Debtor, General Unsecured Claims are classified separately from Senior Notes Claims and General Unsecured Claims are classified separately from Equity Interests. In each instance of separate classification, the Plan classifies Claims based upon their different rights and attributes.[161]

---

[158] Nystrom Direct ¶ 11.

[159] Nystrom Direct ¶ 11.

[160] Nystrom Direct ¶ 11.

[161] Nystrom Direct ¶ 12.

53

132. Valid business, factual and legal reasons exist for separately classifying the various Claims and Interests under the Plan.[162]  Additionally, each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.[163]

133. The Debtors classified the Senior Notes arising under the Senior Notes Indenture and the Subordinated Notes arising under the Subordinated Notes Indenture ("Subordinated Notes") separately because they are not "substantially similar" claims.[164]  Specifically, pursuant to Section 10.02 of the Subordinated Notes Indenture, upon a chapter 11 filing of Hawaiian Telcom, the holders of the Senior Notes Claims (Class 5) are entitled to receive payment in full in cash before the holders of the Subordinated Notes Claims (Class 6) are entitled to receive or retain payment or distribution of any kind or character.[165]

134. Moreover, Senior Notes Claims (Class 5) and General Unsecured Claims (Classes 7-14) are not substantially similar Claims.[166]  General Unsecured

---

[162]  Nystrom Direct ¶ 12.

[163]  Nystrom Direct ¶ 12.

[164]  Nystrom Direct ¶ 13.

[165]  Nystrom Direct ¶ 13.

[166]  Nystrom Direct ¶ 14.

54

Claims are not subordinated to payment in full of the Senior Notes Claims.[167]

135. The classifications were not done for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests.[168]  Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.[169]

### 2. Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).

136. Article III of the Plan specifies that Claims and Equity Interests in Classes 1, 2, 4, 15 and 16 are Unimpaired.  Additionally, Article II of the Plan specifies that Administrative Expense Claims and Priority Tax Claims are Unimpaired, although these Claims are not classified under the Plan.

### 3. Specified Impaired Classes (11 U.S.C. § 1123(a)(3)).

137. Article III of the Plan specifies the treatment of each Impaired Class under the Plan, including Classes 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 17 and 18.

### 4. No Discrimination (11 U.S.C. § 1123(a)(4)).

---

[167]  Nystrom Direct ¶ 14.

[168]  Nystrom Direct ¶ 45.

[169]  Nystrom Direct ¶ 9.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 60 of 99

138. Article III of the Plan provides the same treatment for each Claim or Equity Interest within a particular Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment with respect to such Claim or Equity Interest.

### 5. Implementation Of The Plan (11 U.S.C. § 1123(a)(5)).

139. On October 26, 2009, the Debtors filed the Plan Supplement. On October 28, 2009, November 9, 2009, and December 28, 2009, the Debtors filed certain amendments to the Plan Supplement. The Plan Supplement complies with the terms of the Plan, and the filing and notice of such documents was good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, and no other or further notice is or shall be required. The Debtors are authorized to modify the Plan Supplement following entry of the Confirmation Order in accordance with the terms of the Plan.

140. The Plan Supplement provides adequate and proper means for the Plan's implementation, including, without limitation: (a) the continued corporate existence of the Debtors; (b) the consummation of the Restructuring Transactions; (c) generally allowing for all corporate action necessary to effectuate the Plan, including the assumption of agreements with existing management, appointment of the directors and officers of the Reorganized

56

Debtors, the distribution of the New Common Stock and issuance of any securities required to be issued pursuant to the Plan; (d) the adoption and filing of the Certificates of Incorporation and the By-Laws; (e) cancellation of existing securities and agreements and surrender of existing securities; (f) identification of sources of consideration from which the Debtors will make distributions under the Plan; (g) assumption of the collective bargaining agreement with the IBEW, Local 1357, dated September 13, 2008; (h) the effectuation of the New Term Loan; (i) the effectuation of the Warrant Agreement; (j) the effectuation of the Litigation Trust Agreement; (k) the effectuation and consummation of the Rights Offering; and (l) preservation of certain of the Debtors' Causes of Action.

141. The Secured Parties did not object to the Plan or any of the Plan Supplement documents. The Secured Lenders filed a "reservation of rights" to the Plan Supplement on November 6, 2009, but subsequently released their reservation of rights and agreed on the record that the matter was submitted.[170] At that time, the Court stated that the Plan will be confirmed, subject to the Court's receipt of proposed findings of fact and conclusions of

---

[170] November 13, 2009 Tr. at 225:16-226:1 (counsel for the parties).

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed   12/30/09   Page 62 of 99

law consistent with the evidence adduced and the arguments made at the confirmation trial.[171]

### 6. Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).

142. Section 4.07 of the New Certificate of Incorporation for Hawaiian Telcom Holdco, Inc., attached as Exhibit B to the Plan Supplement, prohibits the issuance of non-voting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code.

### 7. Designation Of Directors And Officers (11 U.S.C. § 1123(a)(7)).

143. Article V.K of the Plan identifies the directors and officers of the Reorganized Debtors to the extent known and, together with the representations made by the Debtors prior to and at the confirmation trial, adequately describes the manner of selection of the remaining directors and officers to be appointed.

144. Hawaiian Telcom Holdco, Inc.'s officers immediately prior to the Effective Date shall serve as the initial officers of Reorganized Hawaiian Telcom on and after the Effective Date. In addition, Article V.K states that Hawaiian Telcom's current President and Chief Executive Officer, Eric K. Yeaman will be appointed to the board of directors of Reorganized Hawaiian Telcom.

---

171     November 13, 2009 Tr. at 228:11-18 (statement by the Court).

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed   12/30/09   Page 63 of 99

145.  The Senior Secured Agent, as the representative for the Secured Lenders, has engaged Spencer Stuart, a world renowned provider of senior-level executive search and leadership consulting services, to assist the Debtors in selecting additional members of the board of directors for Reorganized Hawaiian Telcom.[172]  The manner of selecting the officers and directors of Reorganized Hawaiian Telcom is consistent with Hawaii corporate law, the Bankruptcy Code, the interests of creditors and equity security holders and public policy.[173]  Therefore, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### 8.    Discretionary Contents Of The Plan (11 U.S.C. § 1123(b)).

146.  The other provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code.

#### (a)    The Plan's Release, Injunction And Exculpation Provisions Are Appropriate.

147.  The releases by the Debtors are limited solely to Claims or Causes of Action that belong to the Debtors.  The releases are consensual and only those parties who choose to execute and deliver releases to the Debtors pursuant to Article XI.B.2 of the Plan will be bound by the release provision.  The

---

172    Reich Direct ¶ 41.

173    Nystrom Direct ¶ 29.

59

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 64 of 99

Debtors' release of Claims and Causes of Action is a component of the consensual Plan process.[174]

148. The Debtors' releases were not challenged by any party in the proceeding. The U.S. Trustee challenged the injunction and exculpation provisions, but that dispute was settled during the confirmation trial. As amended, the injunction and exculpation provisions were not contested by any party.

149. The Plan's injunction is necessary to effectuate the Plan Releases and to protect the Reorganized Debtors from any potential litigation from prepetition creditors as they implement the provisions of the Plan after the Effective Date. Any such litigation would hinder the efforts of the Reorganized Debtors to effectively fulfill their responsibilities as contemplated in the Plan and thereby maximize value for all holders of Claims and Interests.[175]

150. The scope of the exculpation provision contained in Article X.C of the Plan is appropriately limited to the Exculpated Parties' participation in these chapter 11 cases, has no effect on liability that results from gross negligence

---

[174] Nystrom Direct ¶ 69.

[175] Nystrom Direct ¶ 70.

60

or willful misconduct, and does not apply to any acts or omissions expressly set forth in and preserved by the Plan.[176]

151.  The Plan would not have materialized if the negotiating parties had not known they would be protected from liability, other than for willful misconduct or gross negligence, in connection therewith.[177]

### (b)  Section 1145 Waiver (11 U.S.C. § 1145).

152.  The Plan provides that the offering, issuance, and distribution of the New Common Stock, the New Warrants and the New Common Stock deliverable upon exercise of the New Warrants, and any subsequent sales, resales or transfers, or other distributions of any such securities, are exempt from any federal or state securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

153.  The Plan meets all three of the requirements for section 1145 of the Bankruptcy Code:  (a) the securities are being offered pursuant to the Plan; (b) the recipients of any securities pursuant to the Plan (i.e., the Secured Parties and the Senior Noteholders) hold a claim against the Debtors; and (c) the recipients of the securities are receiving the securities in exchange for their Claims against the Debtors.

---

[176]  Nystrom Direct ¶ 71.

[177]  Nystrom Direct ¶ 71, November 9, 2009 Tr. at 105:6-9 (Nystrom testimony).

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed  12/30/09   Page 66 of 99

### C. The Debtors Are Proper Debtors (11 U.S.C. § 1129(a)(2)).

154. The Debtors: (a) are proper debtors under section 109 of the Bankruptcy Code; (b) have complied with all applicable provisions of the Bankruptcy Code except as otherwise provided or permitted by order of the Bankruptcy Court; and (c) have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and the Disclosure Statement Order in transmitting the Solicitation Materials and in tabulating the votes with respect to the Plan.

### D. The Debtors Proposed The Plan In Good Faith (11 U.S.C. § 1129(a)(3)).

155. The Debtors proposed the Plan in good faith, with the legitimate and honest purpose of reorganizing Hawaiian Telcom's ongoing business while maximizing the value of each of the Debtors and the recovery to creditors and other stakeholders.

156. The negotiations that culminated in the Plan, as well as the Plan itself, provide further evidence of the Debtors' good faith, as the Plan assures the fair treatment of Holders of Claims and Interests.[178]

157. The Plan is the product of arm's length negotiations between, among other entities, the Debtors and the Secured Parties.[179] The negotiations were time

---

[178] Nystrom Direct ¶ 45; see also section I.A-E supra.

62

consuming, but resulted in a plan that accomplishes the goals Hawaiian Telcom laid out at the outset of these cases.[180]  The negotiations led to a distribution of value according to the Secured Parties' liens and the value of the unencumbered assets.[181]

158.  Consistent with the overriding purpose of chapter 11, these chapter 11 cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and capital resources.[182]

159.  In addition to the extensive negotiations with the Secured Parties, the Debtors' management team maintained open dialogues with other key constituents.[183]  The Debtors worked with the State of Hawaii to keep the HPUC informed about the restructuring process.[184]  Further, the Debtors maintained an open dialogue with the Committee.[185]

---

179   Nystrom Direct ¶ 24.

180   Nystrom Direct ¶ 24.

181   Nystrom Direct ¶ 25.

182   Nystrom Direct ¶ 25; Yeaman Direct ¶¶ 4-5

183   Reich Direct ¶ 25; Yeaman Direct ¶¶ 5-6.

184   Reich Direct ¶ 25.

185   Reich Direct ¶ 25.

63

160. The Debtors also worked diligently to bridge the gap between the Committee and the Secured Parties.[186]  Among other things, the Debtors participated actively in the October 26-29, 2009 mediation in this matter and other continuing settlement discussions.[187]

161. No one has introduced any evidence that would suggest that the Plan was not proposed in good faith.

**E.      Payment For Services Or
        Costs And Expenses (11 U.S.C. § 1129(a)(4)).**

162. Pursuant to Article II of the Plan, all payments made or to be made by the Debtors for services or for costs and expenses in or in connection with the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, have been approved by, or are subject to the approval of, the Bankruptcy Court as reasonable.

**F.      Directors, Officers And Insiders (11 U.S.C. § 1129(a)(5)).**

163. The identity and affiliations of the persons proposed to serve as the initial directors and officers of the Reorganized Debtors have been fully disclosed to the extent known.[188]    Hawaiian Telcom Holdco, Inc.'s officers immediately prior to the Effective Date shall serve as the initial officers of

---

[186]    Yeaman Direct ¶ 6.

[187]    Yeaman Direct ¶ 6.

[188]    November 13, 2009 Tr.  at 134:8-135:2 (statement by Debtors' counsel).

64

Reorganized Hawaiian Telcom on and after the Effective Date.[189] The Debtors have already disclosed the compensation they will receive.[190] In addition, Article V.K states that Hawaiian Telcom's current President and Chief Executive Officer, Eric K. Yeaman will be appointed to the board of directors of Reorganized Hawaiian Telcom.[191]

164. As noted in paragraph 145, above, the Senior Secured Agent, as the representative for the Secured Lenders, has engaged Spencer Stuart, a world renowned provider of senior-level executive search and leadership consulting services, to assist the Debtors in selecting additional members of the board of directors for Reorganized Hawaiian Telcom.[192] The Debtors will file a notice identifying any additional members to be appointed to the board of directors.

165. The manner of appointment or continuance of the proposed directors and officers is consistent with Hawaii corporate law, the Bankruptcy Code, the interests of creditors and equity security holders and with public policy.[193]

---

189  Ex. D-1 at 35 (Plan); Ex. D-3 at 123-223 (Plan Supplement).

190  Ex. D-1 at 36 (Plan); see also ex. D-3 at 65-89, 119-121(Plan Supplement).

191  Nystrom Direct ¶ 28.

192  Nystrom Direct ¶ 28.

193  Nystrom Direct ¶ 29.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed  12/30/09   Page 70 of 99

The directors and officers of Reorganized Hawaiian Telcom who have been identified to date and the process by which the remaining directors and officers will be selected will insure that: (a) Reorganized Hawaii Telcom's directors and officers will have relevant and solid experience in Reorganized Hawaiian Telcom's business and industry and experience in financial and management matters; (b) their appointment does not perpetuate incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor; and (c) the control of Reorganized Hawaiian Telcom by the proposed individuals will be beneficial.[194] The proposed directors and officers are competent and will give Reorganized Hawaiian Telcom both continuity and fresh insights into running the business.[195]

**G.      No Rate Changes (11 U.S.C. § 1129(a)(6)).**

166. The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission.

**H.      Best Interests Of Creditors (11 U.S.C. § 1129(a)(7)).**

167. Each Holder of an Impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or

---

194    Nystrom Direct ¶ 29.

195    Nystrom Direct ¶ 29.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 71 of 99

Equity Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

168. Holder of Claims in Classes 3, 7, 8, 9, 10, 11, 12, 13 and 14 are Impaired and have voted to accept the Plan.[196] Classes 15-18 are also Impaired and were deemed to reject the Plan.

169. Class 5 is Impaired and voted against the Plan.[197]

170. As set forth in the Disclosure Statement, Zolfo Cooper prepared a liquidation analysis reflecting the expected recoveries in a hypothetical chapter 7 liquidation as well as an estimate of the differences in claims and expenses associated with a liquidation under chapter 7 of the Bankruptcy Code.[198] Zolfo Cooper relied on members of Hawaiian Telcom as well as Lazard in developing the liquidation analysis.[199]

---

[196] McGuire Direct ¶ 12.

[197] Sullivan Direct ¶ 8, Ex. A.

Docket No. 1406 Written Supplemental Direct Testimony of Jane Sullivan, Financial Balloting Group LLC ("Sullivan Direct") ¶ 8, Ex. A attached thereto. Ms. Sullivan is Executive Director of Financial Balloting Group LLC ("FBG"). Ms. Sullivan, managed FBG's efforts to serve the Solicitation Packages on the holders of claims in Class 5 consistent with the Solicitation Order. Id. ¶ 1. Ms. Sullivan further managed the tabulation of voting results for the Class 5 Senior Noteholders. Sullivan Direct ¶ 2.

[198] Nystrom Direct ¶ 33.

[199] Nystrom Direct ¶ 33.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed   12/30/09   Page 72 of 99

171. In preparing the liquidation analysis, Hawaiian Telcom assumed there would be a forced going-concern sale of Hawaiian Telcom, instead of a piece-by-piece liquidation of Hawaiian Telcom's assets because liquidation and wind down is not a possibility for Hawaiian Telcom.[200]  Because the hypothetical chapter 7 liquidation would be pursuant to a forced going-concern sale, Zolfo Cooper applied a discount range from 15% to 30% off the midpoint of the enterprise value plus non-core assets.[201]

172. As shown in the liquidation analysis, holders of Class 5 Senior Notes Claims will recover as much or more value as a result of confirmation of the Plan than through a hypothetical chapter 7 liquidation.[202]  The Senior Noteholders, the only class that voted against the Plan, will receive approximately 2.1% recovery under the Plan instead of 0-0.9% recovery under a chapter 7 liquidation.[203]

173. Classes 15-18 will also receive more under the Plan than they would in a chapter 7 liquidation.[204]

---

[200]  Nystrom Direct ¶ 35.

[201]  Nystrom Direct ¶ 33.

[202]  Nystrom Direct ¶ 38.

[203]  Nystrom Direct ¶ 38, Sullivan Direct ¶ 12, McGuire Direct ¶ 8.

[204]  Nystrom Direct ¶ 32.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 73 of 99

174. No party contested the best interests of creditors standard and there is no evidence that Hawaiian Telcom's liquidation analysis is not reasonable or appropriate.

**I.      Acceptance By Certain Classes (11 U.S.C. § 1129(a)(8)).**

175. Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. Classes 1, 2, 4 and 15 are Unimpaired Classes of Claims and Class 16 is a Class of Unimpaired Intercompany Interests, each of which is conclusively deemed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code. Classes 3, 7, 8, 9, 10, 11, 12, 13 and 14, are Impaired Classes and have voted to accept the Plan.[205]

176. Class 5, an Impaired Class, has voted to reject the Plan.[206] Classes 6, 17 and 18 are not receiving any distributions under the Plan and are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

177. The Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code.

**J.      Treatment Of Claims Entitled To Priority Pursuant To Section 507(a) Of The Bankruptcy Code (11 U.S.C. § 1129(a)(9)).**

---

[205]   McGuire Direct ¶ 12.

[206]   Sullivan Direct ¶ 8.

69

178. The treatment of Administrative Claims and Priority Tax Claims as set forth in Article II of the Plan is in accordance with the requirements of section 1129(a)(9) of the Bankruptcy Code.

### K. Acceptance By At Least One Impaired Class (11 U.S.C. § 1129(a)(10)).

179. As set forth in the Voting Report, Classes 3, 7, 8, 9, 10, 11, 12, 13 and 14, all of which are impaired, voted to accept the Plan.[207]

### L. The Plan Is Feasible (11 U.S.C. § 1129(a)(11)).

180. The information in the Disclosure Statement and the evidence proffered or adduced at or prior to the confirmation trial and in the Supporting Declarations: (a) is persuasive and credible, (b) has not been controverted by other evidence and (c) establishes that the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of Reorganized Hawaiian Telcom.

181. The Debtors sought chapter 11 protection primarily because their large debt service obligations limited their ability to respond to the changing competitive landscape.[208] As such, the Plan substantially reduces leverage and debt service and allows Reorganized Hawaiian Telcom to pursue the

---

[207] McGuire Direct ¶ 12.

[208] Reich Direct ¶ 58.

70

strategic initiatives already underway, invest in new products and services and improve operational results.[209]

182. Hawaiian Telcom's business projections, strategic plan and initiatives going forward are evidence that confirmation of a plan of reorganization is not likely to be followed by the liquidation of Reorganized Hawaiian Telcom, or the need for further financial reorganization.[210] The Debtors' financial projections – which show positive net income starting in 2011 – and their projected debt service obligations – which are greatly reduced from prepetition levels – demonstrate the Debtors' ability to meet their obligations under the Plan.[211]

183. Hawaiian Telcom thoroughly analyzed its ability to meet its obligations under the Plan.[212] Once the Plan becomes effective, Hawaiian Telcom's debt obligations will be reduced by approximately $790 million.[213]

---

[209]   Reich Direct ¶ 58.

[210]   Reich Direct ¶ 59.

[211]   Reich Direct ¶ 59.

[212]   Reich Direct ¶ 59.

[213]   Reich Direct ¶¶ 58-59.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed   12/30/09   Page 76 of 99

184. Based on the projections, the Debtors' revised strategic business plan and a significantly deleveraged capital structure, the Debtors will be well-positioned to compete in their industry going forward.[214]

185. No party contested the feasibility of the Plan and Hawaiian Telcom's evidence stands unrebutted and unchallenged.[215]

### M. Payment Of Bankruptcy Fees (11 U.S.C. § 1129(a)(12)).

186. Article XIV.H of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).

### N. Retiree Benefits (11 U.S.C. § 1129(a)(13)).

187. Article V.N of the Plan provides that on or after the Effective Date of the Plan, the payment of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will continue in accordance with applicable law.[216]

### O. Non-Applicability Of Certain Sections (11 U.S.C. §§ 1129(a)(14), (15) and (16)).

188. The Debtors do not owe any domestic support obligations, are not individuals and are not nonprofit corporations. Therefore, sections 1129(a)(14), 1129(a)(15) and 1129(a)(16) of the Bankruptcy Code do not apply to these chapter 11 cases.

---

[214] Reich Direct ¶¶ 58-59.

[215] November 13, 2009 Tr. at 208:1-7 (statement of Committee's counsel).

[216] November 9, 2009 Tr. at 86:22-25 (Nystrom testimony).

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 77 of 99

**P. The Debtors Complied With Section 1129(b) of the Bankruptcy Code.**

189. Hawaiian Telcom has satisfied the "cram down" requirements of sections 1129(b)(1) and (b)(2) with respect to the Impaired Classes that did not vote to accept the Plan. The Plan is "fair and equitable" and does not discriminate unfairly against any impaired class of claims or equity interests.

**1. The Plan Is "Fair and Equitable."**

190. The Plan's waterfall structure is premised on the satisfaction of the absolute priority rule. Specifically, with respect to each objecting Class, no junior Class is receiving a distribution under the Plan unless the claimants in the higher priority objecting Class receive the full value of their claims.[217] In addition, no Class senior to any objecting Class will receive, under the Plan, an amount equal to more than the aggregate amount of its constituents' allowed claims.

191. The Plan's treatment of claims is proper because the Plan distributes value to the Senior Noteholders and other unsecured creditors in an amount greater, in the aggregate, than the value of the unencumbered assets.[218]

**2. There Is No Unfair Discrimination Under The Plan.**

---

217   Nystrom Direct ¶ 45.

218   Nystrom Direct ¶ 46.

73

192. Based on the Debtors' own valuation of their encumbered and unencumbered assets, it is clear that the claims and the legal rights of: (a) the Secured Parties, (b) the Senior Noteholders, and (c) the general unsecured creditors are clearly different.[219] The Plan's classifications and allocation of value between these different classes is based on this independent valuation. There is no unfair discrimination between these classes.[220]

193. Hawaiian Telcom considered, among other factors, that the Senior Noteholders typically are institutional investors.[221] Given the relatively large claims of the Senior Noteholders, the Debtors determined that they could distribute warrants with significant value to the Senior Noteholders.[222] The typical claimants in the General Unsecured Claim Classes, however, are neither institutional investors nor holders of large claims (in comparison to Senior Noteholders), and thus, it would be administratively inconvenient to distribute to them what would amount to de

---

[219]   Nystrom Direct ¶ 46.

[220]   Nystrom Direct ¶ 46.

[221]   Nystrom Direct ¶ 14.

[222]   Nystrom Direct ¶ 14.

74

<u>minimis</u> amounts of warrants.[223]   Moreover, given Reorganized Hawaiian Telcom's liquidity needs post-emergence, it is not feasible and would be damaging to the Debtors to provide cash distributions to the Senior Noteholders in the amount that they seek.[224]

194. Moreover as discussed above, issuing warrants to the Senior Noteholders rather than common stock will save Hawaiian Telcom between $13 and $31 million in tax costs.[225]

**Q.    Only One Plan (11 U.S.C. § 1129(c)).**

195. Other than the Plan (including previous versions thereof), no other plan has been filed for the Debtors in the chapter 11 cases.

**R.    Principal Purpose Of The Plan (11 U.S.C. § 1129(d)).**

196. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act, 15 U.S.C. § 77e.

**S.    The Debtors' Plan Complies
With Section 1127 Of The Bankruptcy Code.**

197. The Debtors have made certain non-material modifications to the Plan (the "Plan Modifications"), which are reflected in the version of the Plan

---

223   Nystrom Direct ¶ 14.

224   Nystrom Direct ¶ 15.

225   Tucker Direct, ¶¶ 26, 28.

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 80 of 99

attached hereto. None of the modifications made since the commencement of solicitation adversely affects the treatment of any Claim or Equity Interest under the Plan. Prior notice regarding the substance of the modifications, together with the filing with the Court of the Plan as modified by the Plan Modifications and the disclosure of the Plan Modifications on the record at the Confirmation Hearing, constitute due and sufficient notice thereof. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, none of these modifications require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code (especially in light of previously provided disclosures), nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The Plan as modified and attached hereto shall constitute the Plan submitted for confirmation by the Court. All documents necessary to implement the Plan, including, without limitation, those contained in the Plan Supplement, and all other relevant and necessary documents have been negotiated in good faith and at arms' length and shall, upon completion of documentation and execution, be valid, binding and enforceable agreements and not be in conflict with any federal or state law.

76

198. In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified by the Plan Modifications. No Holder of a Claim or Equity Interest shall be permitted to change its vote as a consequence of the Plan Modifications.

199. The requirements of section 1127 of the Bankruptcy Code have been satisfied.

**T.    The Debtors' Plan Complies
With Section 1125 Of The Bankruptcy Code.**

200. On August 28, 2009, the Bankruptcy Court entered the Disclosure Statement Order [Docket No. 1131], which, among other things: (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017; (b) fixed August 14, 2009 as the Voting Record Date; (c) fixed October 7, 2009 at 9:30 a.m. Hawaii Standard Time as the date and time for commencement of the confirmation trial; (d) fixed September 30, 2009 at 1:00 p.m. Hawaii Standard Time as the deadline for objecting to the Plan; (e) fixed the date by which the Solicitation Package (as defined in the Disclosure Statement Order) must be distributed to holders of Claims entitled to vote to accept or reject the Plan as within five business days of entry of the Disclosure

77

Statement Order (the "Solicitation Deadline"); (f) approved the procedures for soliciting, receiving and tabulating votes on the Plan and for filing objections to the Plan; (g) established the holders of Claims in Classes 3, 5, 7, 8, 9, 10, 11, 12, 13 and 14 as the only creditors entitled to vote to accept or reject the plan; (h) approved the Solicitation Procedures and the Solicitation Package (as defined in the Disclosure Statement Order); (i) approved the form and method of notice of the confirmation trial; (j) approved the procedures associated with the Rights Offering, including the approval of the Subscription Form; and (k) authorized the Debtors to retain Financial Balloting Group LLC as the securities voting agent and the subscription agent in connection with the Rights Offering.

201. On September 22, 2009 the Bankruptcy Court approved the adjournment of the confirmation trial to November 9, 2009 at 9:30 a.m. Hawaii Standard Time. In connection with the adjournment of the confirmation trial, the court fixed November 2, 2009 at 1:00 p.m. Hawaii Standard Time as the amended deadline for voting to accept or reject the Plan (the "Amended Voting Deadline") and fixed November 2, 2009 at 1:00 p.m. Hawaii Standard Time as the amended deadline for objecting to the Plan (the "Amended Objection Deadline").

U.S. Bankruptcy Court - Hawaii  #08-02005  Dkt # 1569  Filed 12/30/09  Page 83 of 99

202. All parties required to be provided notice have been provided due, proper, timely and adequate notice in compliance with the Disclosure Statement Order, Bankruptcy Rules 2002(b), 3017 and 3020(b) and Local Bankruptcy Rule 3017-1. Affidavit of Service of Jane Sullivan re: Financial Balloting Group LLC's Service of Solicitation Packages and Related Documents on Holders of Publicly Held Notes and Certain Other Parties [Docket No. 1221]; Affidavit of Service of Adam L. Simpson re: Solicitation Packages for the Joint Chapter 11 Plan of Reorganization of Hawaiian Telcom Communications, Inc. and Its Debtor Affiliates [Docket No. 1151]; Certificate of Service of Adam L. Simpson re: Notice of Adjournment of Hearing to Consider Confirmation of the Chapter 11 Plan Filed by the Debtors and Extension of Related Voting and Objection Deadlines [Docket Nos. 1178 and 1179]; Certificate of Service of Adam L. Simpson re: Plan Supplement for Proposed Joint Chapter 11 Plan of Reorganization of Hawaiian Telcom Communications, Inc. and Its Debtor Affiliates Exhibits "A" - "K" [Docket No. 1298].

203. Adequate and sufficient notice of the confirmation trial and any applicable bar dates and hearings described in the Disclosure Statement Order were given in compliance with the Bankruptcy Rules and the Disclosure Statement Order and no other or further notice is or shall be required.

Affidavit of Service of Jane Sullivan re: Financial Balloting Group LLC's Service of Solicitation Packages and Related Documents on Holders of Publicly Held Notes and Certain Other Parties [Docket No. 1221]; Affidavit of Service of Adam L. Simpson re: Solicitation Packages for the Joint Chapter 11 Plan of Reorganization of Hawaiian Telcom Communications, Inc. and Its Debtor Affiliates [Docket No. 1151]; Certificate of Service of Adam L. Simpson re: Notice of Adjournment of Hearing to Consider Confirmation of the Chapter 11 Plan Filed by the Debtors and Extension of Related Voting and Objection Deadlines [Docket Nos. 1178 and 1179]; Certificate of Service of Adam L. Simpson re: Plan Supplement for Proposed Joint Chapter 11 Plan of Reorganization of Hawaiian Telcom Communications, Inc. and Its Debtor Affiliates Exhibits "A" - "K" [Docket No. 1298].

204. In accordance with the Disclosure Statement Order and Bankruptcy Rule 2002(l), on September 4, 2009, the Debtors published the notice of the confirmation trial in *The Honolulu Advertiser*, *The Honolulu-Star Bulletin* and the national edition of the *Wall Street Journal*. Affidavits of Publication of Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed By the Debtors and Related Voting Objection Deadlines; Exhibits "A"-"C" [Docket No. 1275].

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed   12/30/09   Page 85 of 99

205. Based on the record in the chapter 11 cases: (a) the Debtors are deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and (e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors, the Secured Parties and the Committee and all of their respective current or former subsidiaries, affiliates, managed accounts or funds, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all their respective activities relating to the Plan, including, but not limited to, any action or inaction in connection with their participation in the activities described in section 1125 of the Bankruptcy Code and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

## CONCLUSIONS OF LAW

## I. BURDEN OF PROOF

1. To confirm the Plan, the Court must find that the Debtors have satisfied the

81

provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence. In re Ambanc La Mesa Ltd. P'ship, 115 F.3d 650, 653 (9th Cir. 1997) (stating that the bankruptcy court must confirm a plan if the Debtor proves by a preponderance of the evidence that the plan satisfied section 1129(a) of the Bankruptcy Code); In re Arnold and Baker Farms, 177 B.R. 648, 654 (B.A.P. 9th Cir. 1994) (preponderance of the evidence is the correct burden of proof in the context of plan confirmation).

2.      Based upon the evidence and testimony at trial as weighed and balanced by the Court, as well as the pleadings in these chapter 11 cases, the Court finds that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.

## II.     THE DEBTORS PROPERLY ALLOCATED VALUE UNDER THE PLAN.

3.      Under section 506(a) of the Bankruptcy Code, the statute governing determination of secured status, the proposed disposition or use of collateral is of paramount importance to the valuation question. Associates Commercial Corp. v. Rash, 520 U.S. 953, 962 (1997). When a debtor is reorganizing, the appropriate methodology for valuing a secured creditor's collateral is to determine the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition for the same proposed use. Id., 520 U.S. at 965.

82

4. Where debtors intend to reorganize and continue to operate their business, and prospects for reorganization appear favorable, collateral should be valued using the going concern value for purposes of determining the extent of the creditor's secured claim under section 506(a). In re Melgar Enterprises, Inc., 151 B.R. 34, 39 (Bankr. E.D. N.Y. 1993) (Chapter 11 debtors' real estate should be valued at going concern value for purposes of fixing extent of creditor's secured claim); In re Bergh, 141 B.R. 409, 420 (Bankr. D. Minn. 1992) (going concern value was used when valuing collateral under section 506(a) where Chapter 11 debtors intended to use collateral to operate their business); see also In re Kim, 130 F.3d 863, 865 (9th Cir. 1997) (finding that value of entire dry cleaning business, which included the goodwill generated by continuing to operate the business in the same location, was relevant to valuation of creditors' security interests in Chapter 13 debtors' dry cleaning equipment and lease because these assets were worth more as a package than if the two assets were valued separately).

5. A secured claim should be valued to the extent the collateral securing the claim contributes to the estates' going concern value. See In re Penz, 102 B.R. 826, 828 (Bankr. E.D. Okla. 1989) (valuing creditor's secured claim to the extent of collateral's contribution to the estates' going-concern value); see also In re Chateaugay Corp., Inc., 154 B.R. 29, 34 (Bankr. S.D.N.Y.

83

1993) ("To the extent that the going concern value of a particular facility is enhanced by or attributable to assets in which the J & L Bondholders do not have an interest, such value will not be credited towards 'the value of such creditor's interest.'").

6. In apportioning going concern value of a company between encumbered and unencumbered assets, going concern value should be attributed to an asset in proportion to that asset's value in relation to the total value of all of the assets. In re LTV Steel Company, Inc., 285 B.R. 259, 267-68 (Bankr. N.D. Ohio 2002); In re 26 Trumbull Street, 77 B.R. 374, 375-76 (Bankr. D. Conn. 1987).

7. In LTV Steel, the court addressed the issue of allocating proceeds from a bulk sale of a bankrupt steel producer's assets among creditors with security interests in individual assets. See LTV Steel, 285 B.R. at 261. The court looked at the fair market value of the individual assets, with personalty and realty bundled together, and apportioned the sale proceeds among the assets based upon each asset's portion of the total value of all the assets. Id. at 266-67, 269.

8. In 26 Trumbull Street, a chapter 7 trustee sold a debtors' restaurant equipment, furnishings and lease together at an auction. Id. Although the secured creditors had liens on the restaurant equipment and furnishings, they

84

did not have a perfected lien on the lease. Id. In apportioning the total sale value, i.e., going concern value, among the assets, the court used the liquidation values of the individual assets to determine their relative value, and allocated sales proceeds, including goodwill, to each asset proportionally. Id. at 375-76.

9.    In each case cited by the parties, the court found that enterprise value was relevant to a valuation of the secured creditor's collateral where such collateral consisted of the debtor's primary assets and would be used by the debtor to operate its business post-emergence. In re Kim, 130 F.3d at 866 (finding that evidence of enterprise value was the most relevant evidence before the court of the value of collateral that consisted of the primary assets, but not all assets, of the business); In re Chateaugay Corp., 154 B.R. at 32 n.3, 33, 34 (finding that enterprise value was relevant to valuation of collateral that consisted of most, but not all, assets of the business); In re Bergh, 141 B.R. at 419-20. In each of these cases, the courts rejected an asset-by-asset valuation of the collateral. In re Kim, 130 F.3d at 866; In re Chateaugay Corp., 154 B.R. at 34; In re Bergh, 141 B.R. at 420; cf. In re Okla. City Broad. Co., 112 B.R. 425, 429 n.5 (Bankr. W.D. Okla. 1990) (stating that enterprise value would be relevant to a valuation of collateral that consisted of nearly all of the debtor television broadcasting station's

85

assets if and when it became clear that the debtor would continue as a going concern; the court so-stated even though it also found that the secured creditor lacked a lien on the debtor's FCC license without which the business could not operate). There is no precedent that supports the conclusion that a secured creditor with a lien on a debtor's primary assets is not entitled to the debtor's enterprise value when the debtor proposed to use that collateral in its business under a plan of reorganization.

10. After an analysis of the arguments put forth by the Parties and giving proper weight to the evidence in the record regarding the extent of the Secured Parties' liens, the Court finds that the Debtors developed the appropriate methodology to allocate value. Given the findings of fact set forth above regarding the extent of the Secured Parties' liens, the Debtors' total enterprise value and the value of the Debtors' unencumbered assets, the Debtors' methodology allocates sufficient and proper value to all constituents.

11. Further, the Court finds that Hawaiian Telcom correctly followed the guidance of In re LTV Steel Company and In re 26 Trumbull Street and is also consistent with In re Kim, In re Chateaugay, and In re Bergh.

## III. THE ADEQUATE PROTECTION PAYMENTS WERE WARRANTED

12. Section 363(e) of the Bankruptcy Code provides that, "on request of an

86

entity that has an interest in property . . . proposed to be used, sold, or leased by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Pursuant to section 363 of the Bankruptcy Code, the Cash Collateral Order specifically provides that the Secured Parties were entitled to the adequate protection payments to protect against diminution in the value of the collateral securing their claims.

13. An undersecured creditor is entitled to adequate protection payments to the extent that its collateral suffers from diminution in value. See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 370 (1988). Here, the Secured Parties were entitled to the adequate protection payments, because the evidence demonstrates that the value of the collateral securing their claims has diminished since the Petition Date.

14. The Committee has not provided evidence to effectively dispute the fact that the Secured Parties' collateral has suffered from diminution in value since the Petition Date; rather, the Committee's expert conceded that the value of certain of Hawaiian Telcom's equipment, to which the Secured Parties' liens and security interests attach, has deteriorated since the Petition Date and that Hawaiian Telcom's investments in its network have not been sufficient to outweigh this deterioration.

87

15. Finally, distributions under the Plan would not be affected even if the adequate protection payments were recharacterized as payments against principal. The Cash Collateral Order, a product of negotiation between all three parties including the Committee, provides that to the extent that any adequate protection payments are recharacterized, they are entitled to be recharacterized only as payments against principal. Here, the Secured Parties are undersecured by an amount that exceeds the aggregate amount of the adequate protection payments. Accordingly, recharacterization of the adequate protection payments as payments against principal would reduce only the Secured Parties' deficiency claim, which the Secured Parties have agreed to waive.

## IV. GOOD FAITH

16. To satisfy the "good faith" requirement of section 1129(a)(3) of the Bankruptcy Code, "a plan must be intended to achieve a result consistent with the objectives of the Bankruptcy Code." In re Sylmar Plaza, L.P., 314 F.3d 1070, 1074 (9th Cir. 2002) ("A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Bankruptcy Code"); In re Mann Farms Inc., 917 F.2d 1210, 1214 (9th Cir. 1990); In re Corey, 892 F.2d 829, 835 (9th Cir. 1989); In re Boulders on the River, 164 B.R. 99, 103 (B.A.P. 9th Cir. 1994); In re Arnold and Baker

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed 12/30/09   Page 93 of 99

<u>Farms</u>, 177 B.R. 648, 658 (B.A.P. 9th Cir. 1994).

17. Courts in the Ninth Circuit make their good faith determination on a case-by-case basis, taking into account the "totality of the circumstances." <u>Sylmar Plaza</u>, 314 F.3d at 1075.

18. The Court finds the testimony of Hawaiian Telcom's witnesses regarding the good faith, arms-length negotiations to be entirely credible. In particular, Mr. Nystrom, Mr. Yeaman, and Mr. Reich all persuaded the Court that Hawaiian Telcom acted with complete good faith in developing a Plan that maximizes value for all creditors, significantly deleverages the capital structure, and enables Hawaiian Telcom to implement its business plan

## V. CRAM DOWN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE

### A. Unfair Discrimination

19. Although the Plan awards cash to general unsecured creditors and warrants to Senior Noteholders, the Plan does not unfairly discriminate. Section 1129(b) of the Bankruptcy Code does not preclude a plan's disparate treatment of classes of same-priority claims; it prohibits only "unfair" discrimination. 11 U.S.C. § 1129(b)(1). Under the traditional test, a plan does not unfairly discriminate as long as (a) the discrimination is supported by a reasonable basis, (b) the discrimination is necessary for reorganization, (c) the discrimination is proposed in good faith, and (d) the degree of the

89

discrimination is directly related to the basis or rationale for the discrimination. <u>Liberty Nat'l Enters. v. Ambanc La Mesa L.P.</u> (In re Ambanc La Mesa L.P.), 115 F.3d 650, 656 (9th Cir. 1997).

20. Satisfying unsecured trade claims with cash and unsecured debt claims with equity securities in the reorganized debtor is quite common and does not constitute unfair discrimination. "[I]t is generally recognized that "[t]rade creditors have short-term maturities; debenture holders have long-term expectations.' Correspondingly, in this case, the trade creditors are receiving an immediate cash payout, while the Old Note-holders are receiving a package of securities that conform to prepetition long-term expectations. No 'unfairness' is discerned in this necessary disparity in treatment." <u>In re Greater Bay Hotel & Casino, Inc.,</u> 251 B.R. 213, 232 (Bankr. D.N.J. 2000).

21. The evidence presented by Hawaiian Telcom regarding the justification for its classification, as well as the evidence regarding the rationales for payments to different classes in cash and warrants, demonstrates that the Plan does not unfairly discriminate between classes and is fair and equitable. Weighing the evidence in the record, the differences between various classes sufficient to justify the classifications in the Plan. Additionally, based on the uncontested testimony of Mr. Tucker, the Court is convinced that Hawaiian

90

Telcom acted in the best interest of all creditors by using warrants instead of equity to preserve substantial tax benefits.

## B.   The Fair and Equitable Rule

22.   Section 1129(b) of the Bankruptcy Code requires a finding that the Plan is "fair and equitable" – that (a) no holder of a claim or interest that is junior in priority to an impaired class that votes to reject the Plan receives or retains under the Plan any property on account of such junior claim or interest, and (b) no claimant recovers under the Plan more than it is owed.  See 11 U.S.C. § 1129(b)(2)(B)(ii); In re Trans Max Techs., Inc., 349 B.R. 80, 89 (Bankr. D. Nev. 2006) ("One component of fair and equitable treatment is that a plan may not pay a premium to a senior class.").

23.   The Plan is "fair and equitable" even though the Senior Noteholder class rejected the Plan because no holder of a claim or interest that is junior to the claims of the Senior Noteholders will receive or retain any property under the Plan on account of such junior claim or interest.  See 11 U.S.C. § 1129(b)(2)(B)(ii).

24.   Furthermore, the Plan is "fair and equitable" because no claimant recovers under the Plan more than it is owed.  Specifically, under section 506(a) of the Bankruptcy Code, the Secured Parties are entitled to a secured claim in an amount equal to the value of the collateral securing their claims, and are

91

further entitled under the Bankruptcy Code to an unsecured claim in the amount of their deficiency claim, to the extent there is any. 11 U.S.C § 506(a).

25. Under the Plan, the Secured Parties recover less than the full amount of their claim. Specifically, I find that the value of the collateral securing the Secured Parties' claims is equal to the enterprise value of Hawaiian Telcom less the value of the Debtors' unencumbered assets. The distributions under the Plan are consistent with this finding. On account of the secured portion of their claim, the Secured Parties' recovery is equal to the Plan's assumed enterprise value less the Plan's assumed unencumbered asset value. Because the Plan's assumed value of the unencumbered assets is greater than those assets' actual value, the Secured Parties' recovery under the Plan on account of the secured portion of their claim value is less the amount they are entitled to receive. In addition, the Secured Parties recover less than they are entitled to under the Bankruptcy Code on account of the unsecured portion of their claim because they have agreed to waive their deficiency claim.

92

## VI. CONCLUSION

26. The proposed plan of reorganization satisfies the requirements for confirmation, and an order confirming the plan will be entered.

27. Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated in the Findings and Conclusions or herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

Dated: Honolulu, Hawaii, _Dec. 30, 2009_ .


Lloyd King
United States Bankruptcy Judge

93

<u>In re Hawaiian Telcom Communications, Inc., et al.</u>, Chapter 11, Case No. 08-02005; FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE COURT'S DECISION TO CONFIRM THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HAWAIIAN TELCOM COMMUNICATIONS, INC. AND ITS DEBTOR AFFILIATES

U.S. Bankruptcy Court - Hawaii   #08-02005   Dkt # 1569   Filed  12/30/09   Page 99 of 99